**UNITED STATES OZONE CO. et al. v. UNITED STATES OZONE CO. OF AMERICA.**

No. 4641.

Circuit Court of Appeals, Seventh Circuit.

Dec. 20, 1932.

Rehearing Denied Feb. 22, 1933.

Fred Gerlach, of Chicago, Ill., for appellants.

D. P. Wolhaupter, of Washington, D. C., and Wm. Nevarre Cromwell, and F. Allan Minne, both of Chicago, Ill., for appellee.

Befo~e ALSCHULER and SPARKS, Circuit Judges, and WHAM, District Judge.

WHAM, District Judge (after stating the facts as above).

■ Trade-marks, trade-names, business good will, and unfair competition involve closely related principles of law. Trade-marks and trade-names are valuable to their owner because they serve to build up and protect the good will of his business. They are valuable to the buying public, when used as the law contemplates, as a shield against deception. Any use of the trade-mark or the trade-name of another which injures the good will of its owner or deceives the public, or both, constitutes unfair competition. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403 at page 412, 36 S. Ct. 357, 60 L. Ed. 713.

■ Trade-mark rights growing out of prior appropriation and use of a device or symbol to distinguish or identify commodities made or sold by the owner of the trade-mark have long been and continue to be recognized by the common law as property, and as such entitled to protection by the courts. Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550; Stephano Bros. v. Stamatopoulos (C. C. A.) 238 F. 89, L. R. A. 1917C, 1157. Hanover Star Milling Co. v. Metcalf, supra. While trade-mark rights may be fixed or limited by statute, they are not dependent on statutory enactment, but arise under the common law from prior, exclusive appropriation and use. Trade-mark Cases, supra; Piggly Wiggly Corporation v. Saunders (D. C.) 1 F.(2d) 572; Phillips v. Hudnut, 49 App. D. C. 247, 263 F. 643; Stephano Bros. v. Stamatopoulos, supra.

The Trade-Mark Act of 1905, as amended (15 USCA §§ 81–133), without changing the substantive law, provides for the registration of marks used in interstate or foreign commerce which, without statute, would be entitled to legal and equitable protection. Beckwith v. Com'r of Patents, 252 U. S. 538, 40 S. Ct. 414, 64 L. Ed. 705.

■■ Registration of a trade-mark simply constitutes prima facie evidence that the registrant is entitled to the mark, Henderson v. Peter Henderson & Co., 9 F.(2d) 787 (C. C. A. 7); 15 USCA § 96, and in itself gives no property right in the mark, Robertson v. U. S., 52 App. D. C. 368, 287 F. 942; Fulton Waterworks Co. v. Bear Lithia Springs Co., 47 App. D. C. 437; Spiegel v. Zuckerman, 188 F. 63 (C. C. A. 2); Anheuser-Busch, Inc., v. Cohen, 37 F.(2d) 393 (D. C.); United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141. Nor is such registration controlling in a suit involving the common-law rights to the registered mark or in a suit for unfair competition involving its use. B. F. Goodrich Co. v. Kenilworth Mfg. Co. (Cust. & Pat. App.) 40 F.(2d) 121; Postum Cereal Co. v. California Fig Nut Co., 272 U. S. 693, 47 S. Ct. 284, 71 L. Ed. 478.

■ Any person, partnership, corporation, or unincorporated association capable of holding title to personalty may acquire the right to a trade-mark. The owner may be the manufacturer of the article to which the trade-mark is applied or the seller of goods of a particular manufacture or quality to which the distinguishing mark is applied. McLean, v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Nelson v. Winchell, 203 Mass. 75, 89 N. E. 180, 23 L. R. A. (N. S.) 1150; Hughes v. Alfred H. Smith Co. (D. C.) 205 F. 302; Id. (C. C. A.) 209 F. 37; Manitou Springs Mineral Water Co. v. Schueler (C. C. A.) 239 F. 593; Schmalz v. Wooley, 57 N. J. Eq. 303, 41 A. 939, 43 L. R. A. 86, 73 Am. St. Rep. 637; Atlantic Milling Co. v. Robinson (C. C.) 20 F. 217.

A registered trade-mark is assignable in connection with the good will of the business in which the mark is used by a duly acknowledged instrument in writing. 15 USCA § 90.

■■ Trade-mark rights are assignable by the owner with the business or the right to make or sell the commodity which it distinguishes or identifies (Sarrazin v. W. R. Irby Cigar & Tobacco Co., 93 F. 624, 46 L. R. A. 541 [C. C. A. 5]; Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769; though not apart therefrom (The Coca-Cola Bottling Co. v. The Coca-Cola Co. (D. C.) 269 F. 796; Sawilowsky v. Brown (C. C. A.) 288 F. 533; In re Jaysee Corset Co. (D. C.) 201 F. 779; Carroll v. Duluth Superior Milling Co. (C. C. A.) 232 F. 675), and, in the absence of evidence to the contrary, will be assumed to have passed, without formal assignment, with the business when the business with which the trade-mark has been identified is sold or transferred (26 R. C. L. 863; Laughman's Appeal, 128 Pa. 1, 18 A. 415, 5 L. R. A. 599; Seabrook v. Grimes, 107 Md. 410, 68 A. 883, 16 L. R. A. (N. S.) 483, 126 Am. St. Rep. 400; Fish Bros. Wagon Co. v. La Belle Wagon Works, 82 Wis. 546, 52 N. W. 595, 16 L. R. A. 453, 33 Am. St. Rep. 72; Hoxie v. Chaney, 143 Mass. 592, 10 N. E. 713, 58 Am. Rep. 149; Woodward v. White Satin Mills Corporation (C. C. A.) 42 F.(2d) 987. Reploge v. Air Way Co., 52 App. D. C. 364, 287 F. 765; President Suspender Co. v. Macwilliam (C. C. A.) 238 F. 159).

■ Trade-marks, trade-names, and business good will, in connection with the business to which they relate, constitute property in

the hands of their owner. When owned by a bankrupt, except when strictly personal in nature, trade-marks and trade-names pass with the good will of the bankrupt's business to the trustee for the benefit of creditors, and, when the business to which they relate is sold intact by the trustee, they pass in connection with the sale of the business to the purchaser without being specifically mentioned. 11 USCA § 110; Woodward v. White Satin Mills Corporation, supra; S. F. Myers Co. v. Tuttle (C. C.) 183 F. 235; Sarrazin v. W. R. Irby Cigar & Tobacco Co., supra; Wilmer v. Thomas, 74 Md. 485, 22 A. 403, 13 L. R. A. 380; Children's Bootery v. Sutker (1926) 91 Fla. 60, 107 So. 345, 349, 44 A. L. R. 698; Lothrop Pub. Co. v. Lothrop, etc., Co., 191 Mass. 353, 77 N. E. 841, 5 L. R. A. (N. S.) 1077.

█ Reverting to the facts disclosed by the record as stated above, in the light of the enunciated principles of law, we conclude that the ozone company, even though defectively organized as a corporation, was capable of holding title to the trade-mark in question, and that as a selling agent of equipment of a particular quality and source it could and did acquire the trade-mark. It is apparent from the facts that the ozone company and the sterilizer company had common interests, were intended to be and in fact operated as a practical unit. Though the trade-mark was registered by the ozone company, it was used and treated in the operation of the business of the two corporations as the common property of both. The sterilizer company was permitted to and did use the trade-mark in the manufacture, advertisement, and sale of its manufactured products, and the ozone company, acting as the sales and advertising agent of the manufacturer, used it to promote the sales of the same products. By right of prior, exclusive appropriation and use, as against the rest of the world, the two companies acquired the common-law rights to the trade-mark before any dealings were had by either with Montgomery Bros. The respective rights of the two companies as against each other are not here at issue, since the appellee has acquired all the rights in and to the trade-mark owned or possessed by both companies. The ozone company, by duly acknowledged instrument in writing, has assigned the trade-mark and all its rights therein with all its good will as a sales agent of the sterilizer company and its successors to the appellee. The assets of the sterilizer company, consisting of its manufacturing plant and patents, were sold intact by the trustee in

bankruptcy to Loucks and by Loucks to appellee. Since it appears that they were not specifically withheld, the sale intact of the assets and business carried to the purchaser the trade-marks and trade-names used therewith, including the company's rights to the trade-mark in suit.

█ The situation set forth with reference to the trade-mark also prevailed with reference to the trade-name, "United States Ozone Company." The sterilizer company and the ozone company both used the name to identify, advertise, and sell the equipment manufactured by the sterilizer company. Before any contract was entered into with Montgomery Bros. and since, the products of the sterilizer company have been identified in the public mind by the name "United States Ozone Company."

It would be impossible to protect the good will of the sterilizer company to which the appellee has succeeded if the appellee is not protected in the use of the trade-mark and trade-name around which that good will has been built. Likewise, if the trade-mark and trade-name be permitted to be used by appellants in connection with their manufactured products, which, though similar in character, are different in source and admittedly different in construction from those manufactured by the sterilizer company and its successors, the public would undoubtedly be deceived and misled.

█ The claims of appellants to the ownership of and the right to use the trade-mark and trade-name are not convincing. Such claims as they have originated in the sales agency contracts wherein they were given exclusive sales rights, and, solely for the purpose of the contract, were permitted to use the trade-mark and trade-name in advertising and selling the products manufactured by the sterilizer company. Nothing appears in the contract or elsewhere in the evidence which indicates any intention on the part of either the sterilizer company or the ozone company to give up the trade-mark or the trade-name to appellants except for the limited purposes of the contract. When the contract came to an end, appellants' rights to any use of the trade-mark and the trade-name likewise came to an end. Under very similar facts in Morand Bros. v. Chippewa Springs Corp., 2 F. (2d) 237, 239, this court said: "While the contract does not specify that at the end of that time appellant should cease using appellee's trade-name, under which it was selling its water from its spring of the same name,

such we regard is a necessary inference from the contract itself."

Not only is it the necessary inference under the evidence here that the right to use the trade-mark and trade-name was given appellants only for the duration and purposes of the sales contract, but appellants specifically agreed in the 1925 contract to protect the sterilizer company's patents, trade-marks, and trade-names by giving notice of any infringement thereof coming to their knowledge. In the 1924 contract Montgomery Bros. agreed to report to the ozone company any infringement of its trade-marks, trade-names or patents. After the expiration of the 1924 contract, appellants had no agreement with the ozone company concerning the trade-mark and trade-name, and it appears obvious that the ozone company permitted their use solely that the interests of the sterilizer company might be more effectively advanced through its sales contract with Montgomery Bros. Under the circumstances, this was in no sense an abandonment by the ozone company of its rights in the trade-mark and trade-name.

■ It is true that appellant United States Ozone Company has been incorporated under the name "United States Ozone Company" and, if enjoined from using the name in its ozone equipment business, will be compelled, as far as that business is concerned, to give up a name which has been granted to them by the state of Delaware. But this is a case of unfair competition. As was said by the Supreme Court of Florida in Children's Bootery v. Sutker, supra, wherein the use of a corporate name was enjoined: "A corporate name, although derived through authority of the state, cannot be used in a manner which will result in fraud or deception." The incorporators of appellant United States Ozone Company well knew when they chose to incorporate under that name that the use of the name in connection with the sale of ozone equipment not manufactured by the sterilizer company or its successors would inevitably result in deception of the buying public.

In so far as this case deals with the trade-mark in question, it involves the common-law rights therein and the right to its use under the laws of unfair competition. The conflicting registrations in the Patent Office were receivable as prima facie evidence of title and not for the purpose of having the validity of the registrations determined. In determining the trade-mark questions here involved, we have given due consideration to the decision of the Court of Customs and Patent Appeals holding registration No. 239,333 valid and

registration No. 162,145 invalid. United States Ozone Co. v. United States Ozone Co. of America, 58 F.(2d) 1051. So much of the decree of the District Court as declares valid trade-mark registration 162,145 should be eliminated.

■ As found by the District Court, the use by appellants in advertising the equipment manufactured by appellant corporation of customer lists which contain names of customers who purchased either from appellants or from the sterilizer company equipment manufactured by the latter, and the simulation by appellants of the advertising matter that had been used in advertising the business of the sterilizer company to which appellee succeeded, is obviously deceptive and constitutes unfair competition.

■ We also agree with the findings of the trial court that the copyrighted treatise on the use of ozone in the purification of water in swimming pools prepared by Frank E. Hartman while employed by the sterilizer company, though registered in his name, was prepared by him for his employer as part of his duties under his employment, that the sterilizer company became the equitable owner thereof, and that Hartman held the registration in trust for his employer. He could not assign any beneficial interest therein to the appellant corporation, and it has no beneficial interest therein by virtue of the assignment upon which it relies. National Cloak & Suit Co. v. Kaufman (C. C.) 189 F. 215; Colliery Engineer Co. v. United Correspondence Schools Co. (C. C.) 94 F. 152; Bisel v. Ladner, 1 F.(2d) 436 (C. C. A. 3).

The appellants' counterclaim was properly dismissed by the trial court, and the appellee was properly awarded an injunction and an accounting on this branch of the suit which involves unfair competition, the wrongful use by appellants of the trade-mark and trade-name.

■ Patent in suit No. 1,594,947 was held valid and infringed as to claims 1, 2, 4, 7, and 9. It relates to a device for water purification by diffusing through the water under treatment a gaseous purifying agent such as ozone. If brought into actual contact with foreign matter such as bacteria and other microscopic organisms, including disease germs, found in suspension in water, ozone will, according to the evidence, oxidize and destroy such impurities. Ozone being only slightly soluble in water, a perfect result in purification demands a perfect mechanical mixture of the water and ozone since the germs or other

micro-organisms not brought into actual contact with the ozone will escape oxidization and remain in the treated water alive and unaffected.

The structure comprises a cylindrical container with top and base, having at its top an injector, and having inside a multiplicity of concentric tubes in telescopic relation. The suggested structure has four such tubes. The middle or inlet tube, which is directly below the injector, opens at the bottom into the second tube which is sealed at the bottom and opens at the top into the third tube which is sealed at the top and opens at the bottom into the fourth and outside tube.

In operation raw water is fed into the injector at a high rate of speed, creating a vacuum, which draws ozone into the water from a pipe leading from the ozone generator, thus mixing the ozone and water in the injector. The admixture of water and ozone is forced downwardly from the injector through jets into the central tube, falling to the bottom of the container, thence passing into and rising through the second tube to the opening at its top, thence downward through the third tube to the opening at the bottom and into the fourth tube through which it rises to the point of outlet. The fourth tube fills and becomes a column of water from which is drawn off the treated product at an opening or valve located near the top.

As the admixture is forced by the injector into and falls to the bottom of the middle tube and rises through the second, the ozone, being lighter, rises more rapidly than the water through the second tube, passes downward through the third tube, and forces its way upward through the column of water in the fourth tube and escapes to the atmosphere. The column of water in the fourth tube retards the upward passage of the ozone, with the result that a body of ozone under pressure equal to the length of the column of water in the fourth tube is built up in tube 3 and in the chamber at the top of tubes 2 and 3, through which the water under treatment is forced by the pressure from the injector. That the forcing of the water under treatment through the aforesaid body of ozone under pressure results in a more perfect admixture of ozone and water constitutes the basic conception of the patent and its principal improvement over other ozonizers.

To bring the water and the compressed ozone into more intimate contact, there is provided a perforated gutter inside said third tube attached to the top of the wall separating the second and third tubes, causing the water to filter through the gutter and fall through the compressed ozone in the form of drops or fine rain.

When the machine is shut down and the pressure from the injector ceases, the compressed ozone in the third tube and chamber above, if not prevented, would force the water in the second and central tubes backward, and some of it would pass up through the ozone line into the ozone generator, resulting in a short circuit in and destruction of the generator. Wherefore it is not practicable to operate in connection with an ozone generator an ozonizer using ozone under pressure as above described unless some means is provided to prevent the water being forced back into the generator when the ozonizer is shut down. To accomplish this, in the patented structure, a conical valve is placed at the outlet end of the central tube which seals by pressure from below and closes against the backward flow of water from the second tube, a check valve is placed in the connection between the injector device and the source of ozone supply, and, as an additional safeguard a T connection is provided in the ozone line to carry off through a pipe any water that may not be closed off by the valves in the central tube and connections.

The appellants' structure is essentially the same in principle and operation as that shown in the patent. It utilizes the body of ozone under pressure built up in the same way as in the patent in perfecting the admixture of ozone and water, and takes advantage of the further contact caused by the ozone rising and bubbling through the fourth or outside tube. It eliminates entirely the perforated gutter for producing rainfall through the compressed ozone. It substitutes for the valve at the outlet end of the inner tube, the check valve in the connection, and the precautionary T connection in the ozone line, the single device of a pipe leading off from the injector to catch and trap off from the ozone generator the water that may be forced backward by the ozone pressure in the tubes when the machine is shut down.

Appellants contend that the differences noted avoid infringement, and that, without said valves and said means for causing the water to rain through the third tube, the patent in suit is fully anticipated by Otto No. 822,980.

As pointed out in the findings of the District Court, the latter contention cannot be sustained in view of the fact that the Otto structure is not shown to be operative with ozone under pressure. In form it is strikingly like the patented device, but it provides a

port for escape of the ozone at the top of the inner chamber that it may function as a chamber for the separation of the ozone from the water instead of a compression chamber for forcing further admixture. While it is suggested in Otto's patent that the port may be closed or eliminated and the tube used as a compression chamber, it provides no method in such case to prevent the water from being forced back into the generator by the compressed ozone when the machine is shut down. From a study of his patent and his claims thereunder, it seems obvious that Otto had no conception of ozone under pressure as a practical factor in obtaining a more perfect admixture and contact of the water and ozone. Neither does he seem to contemplate the further mixing and contact of the ozone and water which arises from the ozone bubbling up through the water in the outside tube to its escape. He relies for contact between the water and ozone entirely on the admixture in the injector and the additional mixing resulting from the water and ozone flowing simultaneously without pressure through the various tubes to the separation chambers.

Do the differences between appellants' device and the structure in suit avoid the charges of infringement?

The structure in the patent in suit is a new combination of old devices. When a combination of old elements is relied upon for patentability, there will be no infringement if any one of the material parts of the combination is omitted, and the patentee will not be heard to deny the materiality of any element included in his combination claim. Adam v. Folger, 120 F. 260 (C. C. A. 7); Vance v. Campbell, 66 U. S. (1 Black) 427, 17 L. Ed. 168; Union Water-Meter Co. v. Desper, 101 U. S. 332, at page 337, 25 L. Ed. 1024; McClain v. Ortmayer, 141 U. S. 420, at page 423, 12 S. Ct. 76, 35 L. Ed. 800; Burry Ry. Supply Co. v. Laughlin, 297 F. 938, at page 941 (C. C. A. 7).

Turning to the claims involved in this appeal, we find that in each of claims 1, 2, and 7 the patentee has specified as a part of his combination a means for causing the water to rain or fall in the form of rain through the intermediate diffusing column or tube. Having claimed said means as a part of the combination, he is limited in the claims to a structure having such means.

In appellants' structure, all means for producing a rainfall or causing the water to pass through the compressed ozone or the intermediate chamber in the form of fine rain have been omitted. By this omission the ap-

pellants avoid infringement of claims 1, 2, and 7. It is true that the testimony shows that the pressure of the ozone itself upon the water passing over the top of the partition between tubes 2 and 3 will cause the ozone to spill or fall over the top down through tube 3 in a thin sheet or possibly in the form of drops. Conceding this to be true, the result is attained in appellants' device without any "means" provided for the purpose within the import of the means specified in said claims.

Claim 4 omits the means for producing a rainfall of water, but specifies "a valve associated with the discharge end of the inlet tube." Claim 9 omits the means for producing the rainfall of water, but specifies both the valved inlet tube and the valve in the connection between the injector and the source of ozone supply. Both the valve in the tube and the valve in the connection serves to prevent the backward flow of water into the generator when the machine is shut down.

In appellants' structure there is substituted for the valve in the inlet tube and the valve in the connection between the injector and the source of ozone supply, to serve the combined purpose of both, an overflow pipe or trap in the injector which catches and carries off, before it reaches the generator, the water that is forced back through the inlet tube when the machine is closed down.

Whether appellants' structure infringes claims 4 and 9 depends upon whether appellants' pipe escape for the backward flow of water when the machine is shut down, which leads off from the injector, is an equivalent of appellee's valves in the inlet pipe and in the connection above the injector. The law is clear that the change of location of an element in a combination, if the function remains the same, will not avoid infringement. Adam v. Folger, supra. Neither will the union of two elements into one if the one performs the same function in substantially the same way as did the two. Line Material Co. v. Brady Electric Mfg. Co. (C. C. A.) 7 F. (2d) 48; Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585; Walker on Patents (6th Ed.) vol. 1, p. 500.

We have here a combination patent through which, for the first time, the conception of ozone under pressure as a factor in mixing water and ozone is put into practical use. It constitutes a distinct advance in its field. Its merit and utility have been established by popularity on the market over a period of years. Its merit is further attested by appellants' effort, as shown by the evi-

dence, to evade infringement of the patent and at the same time appropriate its substance. After the basic principle of the patent had been conceived and reduced to practice, it is obvious that the prevention of the backward flow of water into the generator so that it would be practicable to use the patented device as a part of an ozonization plant was not a major problem. Numerous well-known expedients varying in form and in location in the structure were open to the inventor. While some means was necessary, neither its form nor its location was material to the functioning or to the patentability of the device. Under these circumstances, the expedient which the inventor chose to specify in his claims should be given a broad range of equivalency in order to protect the substance of his invention. Eibel Process Co. v. Minn. & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 S. Ct. 748, 52 L. Ed. 1122. Appellants did not and could not omit from their structure means for preventing the back flow of water into the generator. To differentiate their machine from the patented device, they simply substituted for the expedients suggested in the claims another well-known expedient which serves precisely the same function by trapping the water off instead of sealing it off. As said in Blake v. Robertson, 94 U. S. 728, at page 733, 24 L. Ed. 245: "It is difficult to resist the conclusion that the change had no motive or purpose but evasion."

In Imhaeuser v. Buerk, 101 U. S. 647, at page 656, 25 L. Ed. 945, the court, in holding a spring and a weight to be mechanical equivalents in the machine under consideration, said: "Patentees of an invention consisting merely of a combination of old ingredients are entitled to equivalents, by which is meant that the patent in respect to each of the respective ingredients comprising the invention covers every other ingredient which, in the same arrangement of the parts, will perform the same function, if it was well known as a proper substitute for the one described in the specification at the date of the patent. Hence it follows that a party who merely substitutes another old ingredient for one of the ingredients of the patented combination is an infringer if the substitute performs the same function as the ingredient for which it is so substituted, and it appears that it was well known at the date of the patent that it was adaptable to that use. Gill v. Wells, 22 Wall. 1, 28 [22 L. Ed. 699]."

We are of the opinion that appellants' structure must be held to infringe claims 4 and 9 of the patent in suit, when the appellee is given the benefit of that broad range of equivalency as to the means claimed for preventing the backward flow of water into the generator, to which we find he is entitled under the law.

Claims 1, 2, 3, 4, 7, and 8 of patent No. 1,667,316 are involved in this appeal. The primary object of the invention covered by the patent is to provide a dehydrator in simple, convenient form susceptible of embodiment in multiple unit form, having means for reactivating the dehydrating material without dismantling or loss of time in operation, that may be manually set in operation as required and which automatically cuts out when the dehydrating medium is reactivated. While the structure covered by the patent may be used for other purposes, it was primarily designed for dehydrating air to be fed to an attached ozone generator.

Before air can safely be fed to the ozone generator without danger of causing an electric spark between the electrodes which may puncture the interposed glass dielectric, disabling the machine, the moisture content of the air must be removed. This is accomplished in the structure here under consideration by passing the air in its natural state through a casing filled with a moisture absorbent material, such as silica jell, which absorbs the moisture from the air, leaving it dry and ready to be passed on through connections into the ozone generator. By continued use, the absorbent material becomes saturated and must be dried out or reactivated to restore its absorptive capacity. This is accomplished by a current of air being driven by a blower over an electrically heated element located in the air intake section, and thence through the material container where the air thus heated vaporizes the moisture in the material, carrying it off through an outlet to atmosphere. When all the moisture has been evaporated from the material, and it is thoroughly dry, the material is said to be reactivated and is ready to be used again.

In the process of reactivation, it is important that the operation continue until the material is entirely dry in order that its capacity for further use in dehydration may be maximum and definitely known. It is further important that the operation cease immediately when the reactivation is complete to prevent waste and to prevent damage to the absorbent material by a continuation of the high temperature in the material container

which immediately ensues when evaporation ceases. This problem was effectively solved for the first time in the progress of the art by the inventor of the patent in suit through his conception of the fact that, since the evaporation of the moisture in the container will absorb part of the heat from the hot air current and hold the temperature down until the material is dry and the evaporation ceases when the temperature is bound immediately to rise, a thermally responsive element placed in the air exhaust of the container and properly gauged can be depended upon to determine when reactivation is complete and automatically to shut down the operation of the reactivating means when and not until reactivation is complete. This conception was utilized by the simple expedient of locating a thermostat in the air exhaust end or cap of the material holder set to react to the higher temperature that immediately follows the cessation of evaporation in the material container which marks complete reactivation of the material, and automatically to break the circuit by which the apparatus is made electrically operative, thus bringing the process to a close.

Appellants contend that this patent lacks both novelty and invention and is not patentable, but, if patentable, is not infringed by appellants' device.

A study of the structures cited by appellants shows that in none has the same perfection and practicability in result been attained in the automatic control of the reactivating means and in none has been used a thermally responsive control means by which advantage is taken of the assured rise in temperature that immediately follows the cessation of moisture evaporation, as above explained. Nor is this idea suggested in any of the structures cited so that it may be said that with such structures in mind it would be likely to occur to a skilled mechanic familiar with the operation of reactivating machinery.

It appears, therefore, that appellee's combination not only produces a new and better result in the field of automatic control of reactivating means, but in doing so utilizes a phenomenon always present in the process of reactivation, never before utilized, which makes the result certain. The presence of this element in the combination, in our opinion, gives it both novelty and invention. That it is patentable is supported by the fact that a patent for the combination was issued by the Patent Office, that it has proved useful and marketable in a large way over a period of years, and, as will be more particularly

pointed out later, that its novel principle of automatic control means rather than those disclosed in other devices has been adopted by appellants in the construction of their machines.

We are of the opinion, however, that only claims 3, 4, and 7 which specifically claim the thermally responsive control means should be held valid. Claims 1, 2, and 8 are too broad to be sustained, since in each there is an attempt to claim any and all means of automatic control which stops the process when reactivation is complete while appellee's patent teaches only the use of the thermally responsive means. There may be other means just as effective yet to be discovered. The field should not be closed to invention. Moreover, other kinds of automatic control are disclosed in references such as Cooke, No. 870,546, and Carroll, No. 1,567,710. Taggart v. Bremner, 295 F. 506 (C. C. A. 7); Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 246, at pages 257, 258, 48 S. Ct. 474, 72 L. Ed. 868.

 Appellants' structure is the same in principle, and, in substantial effect, has all of the elements specified in claims 3, 4, and 7 of the patent. It adopts the basic conception of a thermally responsive automatic control means which reacts to the rising temperature at the outlet end of the material container to shut down the machine following complete reactivation of the material. It is true that appellants' thermostat is located, not in the air cap in the container, but in an adjoining container into which the heated air passes directly from the discharge end of the material container. It is also true that appellants' structure shows a rearrangement and a reversal of parts. But the parts as rearranged have the same functional relation as in the patent. Form does not constitute the essence of the patent in suit nor is the particular form suggested essential to the performance of its functions. Wherefore, the rearrangement or reversal of its parts or a mere change in the location of the parts will not avoid infringement. Walker on Patents (6th Ed.) vol. 1, § 419; Adam v. Folger, supra. There is no essential difference in the two structures, and we hold that appellants' structure infringes claims 3, 4, and 7 of appellee's patent.

In view of the foregoing, we are of the opinion that the decree of the District Court should be modified as follows: (1) The part that declares the trade-mark registration rights of the parties should be eliminated. (2) The part that deals with patent No. 1,-

594,947 should be modified to hold claims 1, 2, and 7 valid but not infringed, and claims 4 and 9 to be valid and infringed. (3) The part that deals with patent No. 1,667,316 should be modified to hold claims 1, 2, and 8 invalid, and claims 3, 4, and 7 valid and infringed. So modified, the decree is affirmed.