FUTURE FARMERS OF AMERICA v.
ROMACK et al.

Civil Action No. 1083–D

United States District Court,
E. D. Illinois.

Sept. 2, 1953.

Davies, Richberg, Tydings, Beebe & Landa, Washington, D. C., by C. Robert Mathis, and Arthur J. Cerra, Washington, D. C., Thomas A. Graham, Danville, Ill., for plaintiff.

Bookwalter, Carter, Gunn & Hickman, Danville, Ill., by Robert Z. Hickman, Danville, Ill., for defendants.

PLATT, District Judge.

After the Court entered its opinion herein plaintiff and defendants moved for a rehearing in accordance with Rule 59 (a) (2), Federal Rules of Civil Procedure, 28 U.S. C.A., and the parties stipulated further evidence in the record. The Court has amended its opinion and made findings of fact and conclusions of law in accordance with this amended opinion.

This action is based upon alleged trademark infringement and unfair competition. Plaintiff seeks to enjoin the defendants from using its trademarked insignia and emblem without its consent. Plaintiff prays an accounting of profits, damages, attorney fees, and costs. The parties have submitted the case to the court upon the plaintiff's right to an injunction and accounting, and have reserved the right to submit further evidence on an accounting and for damages, if the court finds plaintiff is entitled to injunction and accounting. No question of jurisdiction has been raised.[1]

The facts as shown by the evidence are not in dispute. The parties, however, place different interpretations, deductions, and inferences upon this evidence. The court finds the pertinent facts to be briefly as follows: The Future Farmers of America is a corporation chartered by Act of Congress. 36 U.S.C.A. §§ 271–291; Pub.Law 740, 81st Cong., 2nd Sess., Ch. 823, Aug. 30, 1950. Plaintiff's predecessor, Future Farmers of America, a Virginia corporation, was organized and incorporated in 1928. The emblems of the organization were in continuous use since 1928. These emblems were registered in the United States Patent Office by the Virginia corporation in 1941 and 1942. The Virginia corporation was dissolved on November 10, 1950, and an affidavit and certificate to this effect were filed in the office of the Clerk of the United States District Court for the District of Columbia, on February 2, 1951. On November 20, 1951 the Virginia corporation assigned its interests in the trademarks to the plaintiff together with the goodwill of the business in connection therewith, and this assignment was recorded the following day. The assignment read: "nunc pro tunc as of February 2, 1951" and was signed and acknowledged by the president and secretary of the Virginia corporation, as the authorized act of the corporation.

The defendants, doing business under the names of Chapter Supply Company and Southwestern Chapter Supply Company, with offices in Danville, Illinois, are in the business of supplying various clubs and organizations with jackets, T-shirts and other merchandise. Defendants were aware of the Virginia corporation's trademarks as early as 1945 and entered into written contracts with the Virginia corporation providing for the direct sale to F.F.A. members of particular items bearing the F.F.A. emblem and for payment of royalties to the Virginia corporation. These contracts ran from January 1, 1945 to January 1, 1948. The Virginia corporation authorized defendants to sell T-shirts bearing the F.F.A. emblem directly to its supply service, and defendants were permitted to dispose of the T-shirts remaining on hand at the close of 1949. The defendants claim no other permission from plaintiff

1. 28 U.S.C.A. § 1338; 15 U.S.C.A. § 1121.

or its predecessor to sell items bearing the F.F.A. trademarked emblems.

There was also organized the Future Farmers of America Foundation, chartered in the District of Columbia, which by agreement with the Virginia corporation conducted the supply business for the Virginia corporation with the right to use the trademarked emblems. This supply service was taken over by the plaintiff upon its incorporation.

The plaintiff published an official catalogue illustrating its official supplies and equipment which consisted of T-shirts, jackets, neckties, shirts, and other items. All of these had the emblems or trademarks upon them. Defendants made a "deal" with the Texas association of Future Farmers of America in 1951 to sell jackets, T-shirts, and other items bearing the trademarked emblem and insignia, and since that time have sold substantial quantities of these items in Texas. Defendants paid the Texas association a ten percent royalty on all of these sales, and in return Texas published free advertisements of defendants' products in its official magazine. One such advertisement in the May 1951 issue of Texas Future Farmers Magazine stated in part: "We have just secured permission from your state FFA association to sell Corduroy Jackets and other items of clothing with your state name, chapter name and emblem imprinted." This statement was deleted from subsequent advertisements, but the advertisement in the November 1951 issue stated: "We have just secured permission from your state FFA association to sell All Types Of F.F.A. Supplies."

Since 1949 defendants have made sporadic sales of F.F.A. items outside of Texas,[2] including the sale of 23 jackets in Moncks Corner, South Carolina on April 17, 1951 and the sale of one jacket to an F.F.A. member in West Virginia in June or July of 1951. The defendants have also solicited orders from various state agricultural educational leaders, who were advisers of F.F.A., for various F.F.A. items from 1949 to 1952. These solicitations were made by circulars bearing facsimiles of plaintiff's trademarked emblems on equipment.

On November 20, 1951, Dr. William T. Spanton, Chairman of the Board of Directors of F.F.A., plaintiff herein, wrote a letter to Robert A. Manire, second in charge in Texas, saying in part: "It is unfortunate that you have misconceived the extent of the rights and powers of State associations in this connection." But the advertisements with the "permission" statement deleted therefrom were run through the May-June 1952 issue of the Texas Future Farmer. Vannoy Stewart, officer immediately below Mr. Manire in the Texas organization and editor of the Texas magazine, knowing of Dr. Spanton's letter of November 20, 1951, wrote several letters in 1952 to Robert Romack, one of the defendants and manager of Chapter Supply Company, showing his eagerness to continue the arrangement between the defendants and the Texas association.

The May 1951 advertisement was inserted with the knowledge of Mr. Stewart and Mr. Manire, and the advisory council of the Texas association. M. A. Browning, Director of the Division of Vocational Instruction Services in Texas and as such administrator of the Texas F.F.A. program, became apprised of the entire situation in December, 1951. Most of the major decisions concerning the Texas association were made by the advisory council. Mr. Stewart had been delegated blanket authorization to accept advertisements for the magazine. The Texas association accepted royalty checks as late as November 3, 1952, and the money so received went into the association's treasury.

Plaintiff, by Dr. W. T. Spanton, wrote to the defendants on July 26, 1951 and again on November 14, 1951 demanding that the defendants desist from infringing plaintiff's trademarks in its representations, advertisements, and selling, to the Texas association or its members, or to any State association or their members. The defendants refused to change their course of conduct.

2. By stipulation of parties on May 29, 1953, the total sales outside of Texas amounted to approximately $250.00 or $300.00.

This court after preliminary hearing granted a temporary injunction on October 9, 1952 restraining the defendants from selling, advertising, or distributing merchandise or advertising media bearing the trademarked emblems and insignia in all states except Texas. This injunction was entered without prejudice to the questions of fact and . law to be herein determined. The final hearing in this case was held on November 24, 1952.

Based upon these facts, plaintiff's principal contentions are: (1) That the Texas association never gave the defendants permission to use its registered trademarks; (2) That if the May 1951 advertisement constituted such permission this permission was withdrawn immediately after that advertisement appeared; and (3) That even if the Texas association purported to give the defendants this permission it was of no legal effect since the plaintiff is the only registered owner of the marks, and since its charter does not "dilute" its sole and exclusive trademark rights.

█ Plaintiff seeks to substantiate its first two contentions by pointing to the testimony of the Texas officials that they never gave defendants permission to use the marks and that the deal was solely an exchange of advertising for revenue, but actions often speak louder than words, especially when the words are uttered after a controversy is brought into the courts. This court attaches considerable weight to the May 1951 advertisement; to the letter of Dr. Spanton showing his interpretation of the Texas association's conduct in giving consent; and to the fact that the Texas association continued to carry defendants' advertisement long after the receipt of the Spanton letter, long after Texas knew how the plaintiff felt toward the defendants' use of the trademark. And finally, the Texas association continued to accept royalty payments after the instant suit was filed, so that even if the actions of the Texas officials were originally unauthorized when the royalties were received and placed in the treasury of the Texas association, it amounted to a ratification of the act of their officers.[3] The Texas association's entire course of conduct makes it clear that it consented and gave permission to the defendants to place the trademarked emblem and insignia on merchandise to be sold in Texas.

█ Plaintiff's third contention, that the Texas grant of permission to the use of the registered marks could have no legal effect, requires a close scrutiny and analysis of the plaintiff's charter. The relevant sections of the plaintiff's charter are as follows:

Sec. 3. (5), 36 U.S.C.A. § 273 (5):

"The objects and purposes of the corporation shall be— * * *

"(5) to procure for and distribute to State associations, local chapters, and members all official Future Farmers of America supplies and equipment; * * *."

Sec. 4 (11, 12, and 13), 36 U.S.C.A. § 274 (11, 12 and 13):

"The corporation shall have power— * * *

"(11) to procure for and distribute to State associations, local chapters, and members all official Future Farmers of America supplies and equipment;

"(12) to adopt emblems and badges; and

"(13) to do any and all acts and things necessary and proper to carry out the objects and purposes of the corporation."

Sec. 16, 36 U.S.C.A. § 286:

"The corporation, and its duly authorized chapters and associations of chapters, shall have the sole and exclusive right to use the name of Future Farmers of America and the initials FFA as representing an agricultural membership organization and such seals, emblems, and badges as the corporation may lawfully adopt."

3. "Although the contract or other act of an officer, agent, or committee of an association was originally unauthorized, yet the society may ratify it and thus become bound thereby, as where the association accepts the benefits of the unauthorized transaction." 7 C.J.S., Associations, § 20, page 52.

In examining and interpreting these sections of the charter it must be borne in mind that a charter must be accepted in toto as offered. The grantees can not accept one part and reject another. 18 C.J.S., Corporations, § 38, page 419.

Plaintiff claims that it has the sole right to procure "all" F.F.A. supplies for the local associations, chapters, and members. The word "all" is used to designate all supplies and equipment in the sense of all types of supplies and equipment. The absence of the words "sole and exclusive" or words of similar import from the above quoted Sections 3 and 4 of the charter shows the untenability of plaintiff's position, especially in view of the presence of these words in Section 16.[4]

■ The court believes that Congress in the wording of the charter meant what it said. The intention of the legislature is to be obtained primarily from the language used in the statute. 59 C.J., Statutes, § 569, page 952, 82 C.J.S., Statutes, § 322. "[E]ffect must be given, if possible, to the whole statute and every part thereof." 59 C.J., Statutes, § 595, page 995; [See, also, 82 C.J.S., Statutes, § 346.] The inclusion of the words "duly authorized chapters and associations of chapters" in Section 16 and the omission of the words "sole and exclusive" from Sections 3 and 4 were no inadvertent slip on the part of Congress and would indicate it must have been the intention to grant the rights to the emblems to its authorized chapters, and associations of chapters, as well as to the corporation itself.

■ Plaintiff further argues that Section 16 does not cut down the corporation's rights as the registered holder of the trademarks; that Section 16 does not give the duly authorized chapters and associations of chapters any of the incidents of the ownership or rights in the trademarks. Congress evidently contemplated that plaintiff would own the registered trademarks. The plaintiff corporation could not come into existence until the Virginia corporation was dissolved, and furthermore, it could acquire the assets of the Virginia corporation and the F.F.A. Foundation. This is clear in view of Sections 19 and 20, Public Law 740.[5] The registered trademarks were part of the assets of the Virginia corporation. If Congress had anticipated that the registered trademarks would not have been assigned to the newly chartered F.F.A., Section 16 might have been framed as it was in chartering the Red Cross where prior users were mentioned and expressly excepted.[6] By Section 16 Congress granted the chapters and associations of chapters the right to use the name and such emblems and badges as the corporation might lawfully adopt. The corporation did lawfully adopt these emblems, or trademarks, since it continued the supply service and was

4. Also note 36 U.S.C.A. § 114 (Veterans of Foreign Wars) where "exclusive" is used: "The corporation * * * shall have the following powers: * * * to adopt, and have the exclusive right to manufacture and use such emblems and badges as may be deemed necessary in the fulfillment of the purposes of the corporation; * * *."

5. 36 U.S.C.A. § 289:
"The corporation may acquire the assets of the Future Farmers of America, a corporation organized under the laws of the State of Virginia, and of the Future Farmers of America Foundation, Incorporated, * * *."
36 U.S.C.A. § 290:
"The provisions of this chapter shall take effect on the filing * * * of affidavits * * * to the effect that the Virginia corporation known as the Future Farmers of America has been dissolved * * *."

6. "The House Report stated that the Act as amended 'will permit the use of the symbol by * * * such persons, corporations, and associations as actually used the emblem prior to January 5, 1905, for the purposes for which they were so entitled to use it and for the same class of goods. The section, as so amended, grants to the American National Red Cross the fullest protection it is possible to afford it by congressional enactment and at the same time amply protects the concerns possessing vested property rights in the emblem.' H.Rep. No. 1256, 61st Cong., 2d Sess., pp. 2–3." Federal Trade Commission v. A. P. W. Paper Co., 328 U.S. 193, 200, 66 S.Ct. 932, 936, 90 L.Ed. 1165.

assigned the registered trademarks and goodwill of the Virginia corporation. While the chapters and associations of chapters were not mentioned in the assignment of the registered trademarks, or in the charter in acquiring the assets of the Virginia corporation, Congress expressly said that chapters and associations of chapters along with the corporation shall have the "sole and exclusive right to use". The importance of the word "use" is apparent. The right to use is tantamount to the ownership of the trademarks. The ownership of the trademark without the right to use is of no value. This is illustrated by the rule of law: "There is no such right known to the law as an exclusive ownership in a trademark apart from the right to use it in a business. It cannot exist as a right in gross." President Suspender Co. v. Macwilliam, 2 Cir., 238 F. 159, at page 161. Also see Browning King Co. of New York v. Browning King Co., 3 Cir., 176 F.2d 105, at page 106. The corporation, as before stated, was compelled to accept the charter in toto, and thereby said Section 16 and the effect thereof.

Plaintiff at the hearing argued that the chapters and associations of chapters did not conduct a supply business and made no use of the trademarks or their rights provided by said Section 16 of the charter and therefore the chapters and associations of chapters could not own the trademarks or rights for the reason it would constitute ownership in gross. The evidence is that the supply business was operated by the corporation to furnish the members with supplies of a specified quality at a price and that in return the members were to receive the ultimate benefit from the supply business. It cannot be conceived that the supply business was intended for the corporation as a legal entity separately and distinctly from its chapters and associations of chapters. In fact the corporation in its use of the name, trademarks, and emblems was acting for the chapters and associations of chapter which are composed of members.

Public Law 740 authorized these sole and exclusive rights, and it is doubtful if the corporation, chapters, and associations of chapters could lose them even by non use. Inasmuch as the corporation was using the sole and exclusive rights, and the chapters and associations of chapters are part and parcel of the corporation, there is no merit in plaintiff's position.

An examination of other federally chartered corporations emphasizes that the corporation alone does not have the sole and exclusive right to use by the fact of the inclusion of words of similar purport in some instances by Congress and the absence of same in others. A similar paragraph to Section 16 of plaintiff's charter is found in 36 U.S.C.A. § 67p (AMVETS):

"The corporation and its State, regional, and local subdivisions shall have the sole and exclusive right to have and use in carrying out its purposes the name AMVETS (American Veterans of World War II), and such seals, emblems, and badges as the corporation may lawfully adopt."[7]

The charter of the Veterans of Foreign Wars illustrates the language used by Congress when it intended that no one should share the "right to use" the insignia with the corporation. 36 U.S.C.A. § 117:

"The said corporation shall have the sole and exclusive right to have and to use, in carrying out its purposes, the name 'Veterans of Foreign Wars of the United States' and the sole and exclusive right to the use of its corporate seal, emblems, and badges as adopted by said corporation." [8]

It is significant that Congress included "chapters and associations of chapters" or

7. See also for similar wordings 36 U.S. C.A. §§ 48 (American Legion), 56f (United Spanish War Veterans), 87 (United States Blind Veterans), 90h (Disabled American Veterans), 100 (American War Mothers), 238 (Reserve Officers Association), 316 (Military Chaplains of the United States of America), and 379 (United States Olympic Association).

8. See also 36 U.S.C.A. §§ 27 (Boy Scouts of America), 36 (Girl Scouts of America), and 206 (Civil Air Patrol).

similar subdivisions in some charters and omitted them in other charters. Only in the latter instance the parent corporation was given a monopoly or sole and exclusive rights.[9]

The plaintiff maintains that even if by virtue of Section 16 the Texas association had the right to use the trademarks said section should be interpreted as the "right to wear" and not the "right to use" in its broad sense. Such a construction read in context would give to the corporation, chapters and associations of chapters the right to wear to the exclusion of the members, whereas without a doubt it is the members of F.F.A. who would wear the emblem and not the corporation, chapters or associations. If the chapters and associations of chapters were given no more than the right to wear, the corporation itself was given only the right to wear. The word "use" does not justify the limited interpretation "to wear" especially when we consider that Congress was in fact speaking in trademark terminology. In "The Lanham Trade-Mark Act", 15 U.S. C.A. §§ 1051–1127, Congress employed the word "use" often, but never in the narrow sense of "to wear".

This court therefore concludes that the Texas association had the right to use the trademarked emblems and the insignia of the F.F.A. under the charter.

The foregoing conclusion discloses that the court agrees with the interpretation placed upon the charter by the defendants. The defendants further contend that the plaintiff is entitled to no relief for the following reasons: (1) The federal corporation, plaintiff, chartered by Congress for educational purposes can neither own trademark rights nor engage in the merchandising business; (2) That the supplies and equipment as set forth in the charter do not include wearing apparel; and (3) That the trademarks were not transferred to the plaintiff, and even if they were the transfer was not effective until the actual date of the assignment.

The first two contentions of defendants have no merit. The corporation, by Section 4 (6), 36 U.S.C.A. § 274 (6), is given the power to take and hold any property, real or personal, necessary for attaining the objects and accomplishing the purposes of the corporation. "Any person, partnership, corporation, or unincorporated association capable of holding title to personalty may acquire the right to a trademark." United States Ozone Co. v. United States Ozone Co., 7 Cir., 62 F.2d 881, at page 885. Trademarks and the right to their exclusive use are property rights in the sense that the right to one's trade and goodwill that follows from it free from unwarranted interference from others is a property right. Coca-Cola Co. v. Busch, D. C., 44 F.Supp. 405.[10] Section 3 (5) provides as a purpose of the corporation the procuring and distributing to state associations, chapters, and members all official supplies and equipment. Section 4 (11) gives the corporation the power to carry out this purpose. Plaintiff is a nonprofit corporation but such non-profit corporation may engage in business for profit as an incident to its major purpose.[11] Considering the object and purpose of the organization, it is obvious it had the authority to engage in merchandising jackets, T-shirts, decalcomania products and so forth, all of which would be included in supplies and equipment. A distinctive uniform has direct appeal to youth to join,

---

9. "The use by [Congress] of certain language in one instance and wholly different language in the other indicates that different results were intended * * *." 50 Am.Jur., Statutes, Sec. 274, page 261.

10. Also see General Baking Co. v. Goldblatt Bros., 7 Cir., 90 F.2d 241.

11. State ex rel. Bartlett v. National Ass'n of Angling & Casting Clubs, Ohio App., 1943, 51 N.E.2d 662, where the court held the association, a non-profit corporation, was empowered, as an incident to its purposes, to engage in merchandising for profit, where the profit was used for expenses and maintenance of the organization.
   See also Santa Clara Female Academy v. Sullivan, 116 Ill. 375, at page 387, 6 N.E. 183; Debs Memorial Radio Fund v. Commissioner of Int. Rev., 2 Cir., 148 F.2d 948.

and probably is just as effective on older groups.

■ Defendants maintain further that the trademarks were not transferred to the plaintiff, and even if they were the transfer was not effective until the actual date of the assignment. Regardless of when the assignment by the Virginia corporation to the federal corporation was effective, the evidence discloses that the plaintiff took over the supply business and was using the trademarks after it came into existence. The defendants had no property rights in the trademarks. The Virginia corporation's actual assignment of its trademark rights and goodwill, dated November 20, 1951 nunc pro tunc as of February 2, 1951, might not be effective res inter alios acta until November 20, 1951, unless the Virginia corporation by resolution transferred all of its assets to plaintiff February 2, 1951.[12] The assignment was effective as of November 20, 1951 at the latest. The defendants also take the unsound position that because the Virginia corporation dissolved as of November 10, 1950 the assignment was invalid. The Virginia Corporation Act gives the corporation three years to wind up its affairs, including the disposal of its assets.[13]

■ Defendants have requested a finding that there was no competent evidence that any person purchased from the defendants under mistake or confusion as to the source of the goods. Plaintiff had established itself as selling official F.F.A. supplies and equipment. Its catalogue was published and distributed. The defend-

ants' jacket in evidence had no distinguishing mark as to the source of origin.[14] The defendants in their circulars which were mailed to the agriculture teachers and advisers all over the United States used a facsimile of the plaintiff's trademark. On some of these circulars the defendants stated they were not suppliers of official jackets but not on others. Supplies were also offered for sale with no such statement. Clearly the defendants were attempting where they had no permission to use the trademark to palm off their merchandise as official supplies. Whether there was an actual buyer confusion as to the source or not, there certainly was a likelihood of confusion. The defendants' requested finding is not material to granting plaintiff relief. Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., 7 Cir., 205 F.2d 921; Barbasol Co. v. Jacobs, 7 Cir., 160 F.2d 336; Benrose Fabrics Corp. v. Rosenstein, 7 Cir., 183 F.2d 355; 15 U.S.C.A. § 1114 (1) (a).[15]

■ Eliminating the sales made through the Texas association, the record as it now stands does not justify an accounting or an award of damages. "[W]here damages or profits are trivial, or disproportionate to the expense of taking an account, a decree for that purpose should not be entered." Julius Kessler & Co. v. Goldstrom, 8 Cir., 177 F. 392, at page 394. See Hewes v. Gay, D.C., 11 F.2d 165, at page 169; Consumers Petroleum Co. v. Consumers Co. of Illinois, 7 Cir., 169 F.2d 153, at page 163.

■ In conclusion, therefore, the court finds as a matter of law:

12. "Nunc pro tunc—now for then—an entry now for something previously done." The Princess Sophia, D.C., 36 F.2d 591, at page 594.
"Trade-mark rights are assignable * * * and, in the absence of evidence to the contrary, will be assumed to have passed, without formal assignment, with the business when the business with which the trade-mark has been identified is sold or transferred (citing cases)." United States Ozone Co. v. United States Ozone Co., supra, 62 F.2d at page 885; Ph. Schnieder Brewing Co. v. Century Distilling Co., 10 Cir., 107 F.2d 699, at page 703.

13. Code of Virginia, Title 13, Section 70; Tazewell Electric Light & Power Co. v. Strother, 4 Cir., 84 F.2d 327.

14. See Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 138 F.2d 824, where the court held that the Boy Scouts of America could protect themselves as having a cognizable interest in just the use of the word "Scout" on knives for the reason that this permitted possible confusion that the knives were approved as official.

15. Also see on basis of unfair competition, 63 C.J., Trade-Marks, Sec. 104, at page 399; Investors Syndicate of America v. Hughes, 378 Ill. 413, at page 422, 38 N. E.2d 754.

804

(1) That the Texas association gave the authority to the defendants to use the trademark rights, and that this permission continued at least through November 3, 1952, being the last date that the Texas association accepted royalty payments from the defendants as shown by the evidence now before the court;

(2) That the Texas association had the right and power to grant this permission to the defendants; and that therefore no rights of the plaintiff were infringed upon by the sales in Texas which were made while the defendants had this permission from the Texas association;

(3) That plaintiff is entitled to the protection of its trademark rights;

(4) That the defendants infringed upon plaintiff's trademark rights insofar as defendants made use of the trademarked emblems and insignia without authorization of plaintiff, its duly authorized chapters or associations of chapters.

Injunction will therefore issue restraining the defendants from further use of plaintiff's trademarks without authorization or permission of Future Farmers of America, or its chapters or associations of chapters. Findings of fact and conclusions of law may be submitted together with final order conforming with this opinion.[16]

16.   See Koehler v. United States, 7 Cir., 200 F.2d 588, at page 592.