## WYATT et al. v. MAMMOTH CAVE DEVELOPMENT CO. et al.

## MAMMOTH CAVE DEVELOPMENT CO., et al. v. WYATT et al.

Circuit Court of Appeals, Sixth Circuit.
May 16, 1928.

Nos. 4893 and 4899.

1. **Trade-marks and trade-names and unfair competition ⚖=73(1)—Neither descriptive word "Mammoth" nor geographical name "Mammoth Cave" can be exclusively appropriated by trustees holding title to part of land over cave.**

Neither descriptive word "Mammoth" nor geographical name "Mammoth Cave" can be exclusively appropriated by trustees holding title to part of land over cave.

2. **Trade-marks and trade-names and unfair competition ⚖=73(1)—Complainants extending limits of cave beyond their land cannot claim name "Mammoth Cave" has acquired secondary meaning applying only to cave under their land.**

Where complainants and their predecessors in title had extended limits of cave beyond land owned by them and did not use name "Mammoth Cave" as limited to any part of cave, but used it as including entire cave as nature created it, complainants cannot be heard to say that name "Mammoth Cave" has acquired secondary meaning applicable only to portion of cave underlying their land.

3. **Trade-marks and trade-names and unfair competition ⚖=73(1)—Complainants, while not entitled to monopolize name "Mammoth Cave," held entitled to reasonable protection as to features lying within their boundary.**

Complainants, while not entitled to monopolize name "Mammoth Cave" as to part of cave lying beneath their land, held entitled to reasonable protection as to features of cave lying within their boundary.

4. **Trade-marks and trade-names and unfair competition ⚖=95(1)—Temporary injunction restraining defendants from representing they were showing features of Mammoth Cave underlying complainants' land held proper.**

Temporary injunction, restraining defendants from representing to public that they were showing and had right to show all features of Mammoth Cave, including those underlying complainants' land by requiring defendants to explain in descriptive matter and otherwise that they did not show any part of cave which prior to 1907 was generally known to public as Mammoth Cave, *held* to sufficiently protect public and accord complainants all protection to which they were entitled, and not to unduly restrict defendants' conduct.

Appeal from the District Court of the United States for the Western District of Kentucky; Charles I. Dawson, Judge.

Suit by William E. Wyatt and another, trustees under the will of John Croghan, deceased, against the Mammoth Cave Development Company and others. From the decree, complainants appeal, and defendants file cross-appeal. Affirmed.

Cause No. 4893 is an appeal from a decree of the District Court denying in part and granting in part the appellants' motion for a temporary injunction in an action brought by appellants to enjoin the Mammoth Cave Development Company and the other named defendants, their officers, agents, and employees, from using the word "Mammoth Cave" in connection with any and all advertising matter and from representing orally or in any other way, directly or indirectly, that they or any of them have access to or can exhibit Mammoth Cave to the public by or through any entrance other than the natural entrance located on land held in trust by plaintiffs and for the ascertainment of damages and a decree therefor. No. 4899 is a cross-appeal from the same decree.

Plaintiffs claim title as trustees under the will of John Croghan, deceased, to 1,610 acres of land upon which there is located a natural opening to Mammoth Cave. By the terms of John Croghan's will, which was admitted to probate February 5, 1849, he devised this land, of which he died seized, in trust to three trustees named therein, and, among other things, directed his trustees to maintain and operate Mammoth Cave as a place of interest to be shown to the public upon payment of an admission fee until all of his nephews and nieces "shall have died," and upon the death of each and all of said nephews and nieces to sell the same at public sale and distribute the proceeds per stirpes to their legal heirs.

The pleadings are quite voluminous, but, in substance, complainants allege that they are the successors of the trustees named in the will of John Croghan, deceased; that, in pursuance of the direction in the will, these trustees and their predecessors have exhibited Mammoth Cave, and have expended large sums of money in exploring, developing, and advertising the same in books, pamphlets, guide books, magazine articles, newspapers, and other publications of national and international circulation for more than 80 years last past under the title of "Mammoth Cave," which name has acquired a secondary meaning, having reference to the particular cave underlying the property of the trustees, and to which access was had by the single natural entrance located upon this land; that for nearly 100 years people have visited this cave in gradually increasing numbers, and have paid the admission fee of $2 each to enter Mammoth Cave solely through

this natural entrance; that its 200 avenues and halls, located on five levels, exceed 150 miles; that the Mammoth Cave Development Company has constructed an artificial opening to a cave not on the property owned and used by the trustees, but which is ultimately connected by a narrow and devious passage with Mammoth Cave, and has been guilty of unfair competition, in that it has, over the protest of the trustees and without right, exhibited, and continues to exhibit its cave under the name "Mammoth Cave" or "New Entrance to Mammoth Cave" and by means of handbills, circulars, pamphlets, signs, billboards, posters, pictures, and personal solicitation of runners has represented to the public that its cave is Mammoth Cave; that these representations are deceptive, false, and misleading; that the Mammoth Cave Development Company and other named defendants, acting in concert, by these false and misleading advertisements, statements, and threats of violence to complainants' agents and employees, have hindered, delayed, and prevented the general public from visiting Mammoth Cave owned by the trustees and have induced them to visit the so-called "New Entrance to Mammoth Cave." A bibliography of this cave is attached as Exhibit No. 2 to the bill of complaint.

The defendants filed a joint answer admitting that John Croghan died seized of the 1,610 acres which he devised to certain trustees named therein, but for want of knowledge deny that complainants are the legal trustees of Croghan's estate. They also deny that all of Mammoth Cave lies under the land claimed by complainants, and further answering say that prior to 1844 John Croghan probably believed that most of Mammoth Cave was located beneath the surface of the 1,610-acre tract owned by him, but that in "Rambles in the Mammoth Cave," published in 1844 and cited in Complainants' Exhibit 2, Croghan described "Martha's Vineyard," "Hovey's Cathedral Domes" and other chambers and places of interest located in and under lands other than the land owned or controlled by him, as included in and part of Mammoth Cave.

Defendants further answering say that Mammoth Cave is one immense cavern or cave, consisting of many chambers, galleries, and avenues, and containing many wonderful domes, mineral deposits, and scenic wonders capable of easy exhibition to the public; that much of said cave is unknown and unexplored, but the avenues, halls, and passageways of the explored portions exceed many times the 150 miles underlying complainants' land; that said cave is located in a country of limestone formation, and was formed by the erosion of water following natural lines of cleavage or soft portions of limestone beneath the surface, and that this cave or original underground waterway has existed and is now one continuous and unbroken cave or cavern; that much more of Mammoth Cave, suitable for exhibition purposes, is located in, on, and under the property owned and controlled by the Mammoth Cave Development Company than in land owned by the complainants or their predecessors in title, and that for many years last past a major portion of the cave exhibited by complainants was in land that these trustees do not own or claim to own or to have any license to explore or exhibit, and that a large portion of Mammoth Cave exhibited by complainants was and is located in lands owned and controlled by the Mammoth Cave Development Company.

The defendants deny that they ever advertised to the public the old entrance to Mammoth Cave, the "Cork Screw," or "Fat Man's Misery," or any other feature owned or claimed by plaintiff, but, on the contrary, have opened and are operating a "New Entrance to Mammoth Cave" and are exhibiting "Pinson's Pass," "Hawkin's Way," 'Edna's Dome," "Einbigler's Dome," "Hovey's Cathedral Dome," and many other features and places which complainants formerly and truthfully advertised as part of Mammoth Cave, and prior to 1921 exhibited as part thereof, without permission or license from the owner; that defendants are likewise exhibiting many other natural wonders of Mammoth Cave owned and controlled by them, which have been discovered since 1921, and which are so remote from the complainants' opening as to make their exhibition from that opening impracticable.

Defendants further deny that visitors to Mammoth Cave have for the last hundred years visited it only through a natural opening on the premises claimed by plaintiff, or that said natural opening has been used during the last 75 years, and deny that the general public came to know Mammoth Cave as a cavern located wholly under the complainants' property, and say that such portion of the public as were so misinformed were misled by the intentional statements of the complainants and their predecessors in title, who wrongfully exhibited the property of others and attempted to prevent any survey that would establish the truth, and also deny that complainants or their predecessors in title have caused the words "Mammoth Cave"

to acquire any special or secondary meaning applicable only to that part of Mammoth Cave entered from or lying beneath complainants' land, and deny that complainants could, by falsely claiming control of that to which they had no legal right, create such special or secondary meaning, or that such special or secondary meaning is capable of being created in or attaching to any works of God or nature or in or to the names thereof.

Defendants also deny in detail all and singular the averments of the bill of complaint in reference to false and fraudulent misrepresentation or unfair competition, and deny that the phrase "New Entrance to Mammoth Cave" is deceptive, false, or misleading.

Upon motion for a temporary injunction, heard upon oral evidence, affidavits, and exhibits, the court denied an injunction in accordance with the prayer in the bill of complaint, but granted a temporary injunction enjoining the defendants, their officers and agents, from any verbal description or oral solicitation of trade or business, or exhibiting, circulating, distributing circulars, folders, signboards, handbills, etc., or other printed, written, or descriptive matter wherein "Mammoth Cave" is used, except that, wherever the phrase "Mammoth Cave" or "New Entrance to Mammoth Cave" occurs there shall be placed in immediate juxtaposition to these words in type or lettering of the same size, style, and legibility, and equally prominent, or in case of verbal or oral description or solicitation, a full verbal explanation to the same effect, the phrase "We do not show any part of the cave which prior to 1907 was generally known to the public as Mammoth Cave; that portion of the cave can be seen only through the old entrance." The court further ordered that all existing signboards should be removed or changed to conform with the above requirements, and that in all oral solicitations the defendants should fully and fairly explain that the parts of the cave shown through the new entrance did not include the parts of the cave now being shown through the old entrance.

Wm. Marshall Bullitt, of Louisville, Ky. (R. Lee Blackwell, Eugene B. Cochran, and Bruce & Bullitt, all of Louisville, Ky., on the brief), for Wyatt and others.

John Marshall, Jr., and Ernest Woodward, both of Louisville, Ky. (Woodward, Warfield & Hobson, of Louisville, Ky., on the brief), for Mammoth Cave Development Co.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). The evidence is practically conclusive that Mammoth Cave consists of many chambers, halls, avenues, and narrower passageways, created at the same time and by the same forces, forming one colossal work of nature, which cannot be limited to any particular part thereof by artificial boundary lines upon the surface. It does not clearly appear when this cave was first discovered, probably in the latter part of the eighteenth century, but it is at least certain that a natural opening to this cave was discovered or rediscovered about 1809 by a hunter named Houchins while in pursuit of a bear. This opening was located on a 200-acre tract of land conveyed in 1811 by Flatt to McClean. It first came into public notice during the War of 1812, when saltpeter was extracted for powder-making purposes, from its nitrous deposits. It was then known as "Mammoth Cave," but its extent and boundaries were then and still are unknown. It would seem far more probable that it was given the name "Mammoth Cave" by reason of its immense size and the large dimensions of its chambers, halls, and avenues, than because it was then supposed to contain the bones of a mammoth.

Shortly after the War of 1812, the explored parts of this cave were exhibited to the public through the natural opening located on the 200 acres deeded by Flatt to McClean. It had become world famous long before the purchase by Croghan, who, though a resident of Kentucky, learned for the first time, while traveling in Europe, that such a cave existed. Upon his return from Europe he purchased not only the 200 acres upon which the natural opening was located, but also an additional 1,410 acres adjacent thereto. Croghan and his trustees explored, developed, named, and exhibited to the public for a fee, not only the caverns and passageways underlying the 1,610 acres, but also a considerable number of chambers and passageways, hereinafter mentioned, that were under adjacent lands but were advertised as features of Mammoth Cave, and appeared in the recognized standard guidebook as constituent parts thereof.

It was early apparent, not only to Croghan, but to the more careful observers among the visitors, that this cave extended into lands other than Croghan owned and to lands other than the adjacent lands explored by him. Nathanael Parker Willis, in a book "Health Trips to the Tropics," cited in Exhibit 2, re-

fers to the great vigilance exercised by Croghan to prevent owners of adjacent lands from determining the exact extent of the cave, "lest they might dig down and establish an entrance to the cave on their own property." The trustees seem to have been equally vigilant. This vigilance on the part of Croghan and his trustees delayed the exploration of a large part of Mammoth Cave for at least three-quarters of a century, during all of which time the public was deprived of visiting and viewing many of the cave's interesting chambers and bizarre formations, located beyond the chambers exhibited by Croghan and his trustees, and, no doubt, the less observant of the visitors believed and understood, not that the parts and features underlying the Croghan land, but, on the contrary, the parts and features shown by Croghan and later by his trustees, under their own and adjacent lands constituted the entirety of Mammoth Cave.

[1] The word "Mammoth," used in connection with this particular cave, is clearly descriptive, and the name "Mammoth Cave" is a geographical name used for more than a century to designate this particular natural formation. Under the facts of this case, neither the descriptive word "Mammoth" nor the geographical name "Mammoth Cave" can be exclusively appropriated by the plaintiffs. Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 U. S. 446, 453, 454, 31 S. Ct. 456, 55 L. Ed. 536; Hamilton Shoe Co. v. Wolfe Bros. & Co., 240 U. S. 251, 257, 36 S. Ct. 269, 60 L. Ed. 629; Canal Co. v. Clark, 80 U. S. (13 Wall.) 311, 324, 325, 20 L. Ed. 581; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 S. Ct. 151, 37 L. Ed. 1144; Elgin Natl. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 673, 21 S. Ct. 270, 45 L. Ed. 365; Genesee Salt Co. v. Burnap (C. C. A.) 73 F. 818; Allen Wrisley Co. v. Iowa Soap Co. (C. C. A.) 122 F. 796. Nor can the claim be sustained that the name has acquired a secondary meaning so that it applies solely to the parts of the cave underlying complainants' property.

In this respect, this case differs wholly from Kresge Co. v. Champion Spark Plug Co., 3 F.(2d) 415, in which it was held by this court that the word "Standard" as applied to parts of an automobile had come to be generally understood as indicating that these parts were the "standard" used by the manufacturer in the car's original equipment. The facts of this case clearly distinguish it from ordinary commercial transactions in which descriptive words or names may acquire a secondary meaning. The name "Mammoth Cave" designates a particular natural formation. It differs in no respect from other geographical names, such as "Lackawanna Valley," "Mississippi River" or similar names which cannot acquire a secondary meaning applicable to a part only of the natural object so designated and known by that name, which name others than claimant may employ with equal truth, and therefore have equal rights to use the same. Canal Co. v. Clark, supra.

[2] Even if the name of this natural formation could acquire a secondary meaning and as such be applicable to only a part thereof, the complainants are in no position to assert such claim. They and their predecessors in title have by exploration and development extended its limits far beyond the explored and known parts at the time the name was first applied to this stupendous work of nature, and under which name it became world famous before the Croghan purchase. The natural opening was located on 200 acres owned by McClean. It does not appear that he or his immediate successors in title explored or exhibited any more of the cave than was located under his land. Croghan not only bought this 200 acres upon which this opening was located, but a total of 1,610 acres, and, under his management and control and the management and control of his trustees, this cave has been explored not only to the limits of the 1,610 acres, but far into the lands of adjacent proprietors, new passageways and chambers were discovered, named and opened to the public. These new features include "Martha's Vineyard," "Hovey's Cathedral Domes," "Einbigler's Dome," "Edna's Dome," "Nelson's Dome," and other places of interest underlying the land of adjacent proprietors. These parts of the cave have been advertised and exhibited by Croghan and his trustees in connection with the features underlying the Croghan land as Mammoth Cave.

John Croghan knew that this cave was not confined to his land. In his book, to which reference is above made, he states "That great subterranean territory mainly extends itself under a range of highlands or cliffs earlier described;" and again, "I emphasize some of the avenues because no visitor has yet seen one in twenty, so wonderfully vast is the cave." The trustees also had like knowledge. The secretary and treasurer of the trustees, who was called as a witness on behalf of complainants testified: "The cave was larger and extended beyond the part we regularly showed and had many avenues." Hovey's Guide Book included in its descrip-

tion of Mammoth Cave, "Nelson's Dome," "Einbigler's Dome," "Edna's Dome," "Hawkin's Way," "Hovey's Cathedral Domes," and other features located in adjacent lands. Some of these are a great distance from Croghan's surface lines. It is therefore quite evident that Croghan and his trustees did not understand, believe, or use the name "Mammoth Cave" as limited to any part of this cave, but, on the contrary, as including and comprehending the entire cave as nature created it, and with that belief and understanding logically and truthfully included in their advertisements and guidebooks all new discoveries as parts of this cave, whether such discoveries were in and under their land or adjoining lands.

It is said, however, that the trustees are not responsible for what appeared in Hovey's book. This contention overlooks the testimony of the secretary and treasurer of the trustees that "Hovey's book is the recognized standard guidebook of Mammoth Cave, and we possibly sold a copy to Mr. L. M. Render on the 5th day of April, 1915." It also appears from the testimony of complainants' witnesses that Hovey's Guide Book was sold to visitors by concessionaries and particularly by the souvenir department in the hotel building owned by the trustees and in which they have their office.

It is also claimed that "Cathedral Dome" was not regularly exhibited by the trustees. That is no doubt true. It is located at such a distance from the other features that it was rarely, if ever, exhibited to visitors unless they were willing to pay the extra price of $5 to the guide. It was, however, included as a feature of Mammoth Cave in "the recognized standard guidebook" sold at the cave by complainants and their concessionaries.

In view of these facts, clearly established by the evidence, complainants cannot now be heard to say that the name "Mammoth Cave" has acquired a secondary meaning applicable only to the portion of the cave underlying their land. That is evidently a new thought, suggested by the exigencies of this case.

[3] Notwithstanding the fact that complainants are not entitled to monopolize the name "Mammoth Cave" to the exclusion of adjoining proprietors under whose lands a large part of this cave is situated, and notwithstanding the fact that these words have acquired no secondary meaning applicable to the portion of the cave underlying their premises, but, on the contrary, have been applied by complainants themselves to a considerable portion of the cave underlying adjacent lands, they are nevertheless entitled to reasonable protection as to the features lying within their boundary.

It is apparent from the pleadings and the evidence that the trustees of the Croghan estate and the officers of the Mammoth Cave Development Company believe that they have superior attractions to the public in the parts of the cave owned and controlled by them respectively. They are entitled to their opinion in this respect, but they should have sufficient confidence in that opinion to base thereon their respective claims for public patronage, without any misrepresentation whatever as to the facts.

[4] Defendants have been guilty of many objectionable methods and practices in their efforts to attract visitors to the part of the cave shown through the new opening. Among other things they have placed signs, published and distributed advertising matter, and made oral statements tending to mislead the public into the belief that they were showing, and had a right to show, all the interesting features of Mammoth Cave, including not only those underlying their own property and surface rights, but also those underlying the complainants' land. This is unfair, not only to the complainants, but the general public. Each prospective visitor is entitled to know the facts and judge for himself which parts of the cave he prefers to visit.

Upon a careful review of all the testimony and exhibits in this record, we have reached the conclusion that the temporary injunction granted by the District Court will fully protect the public and accord to the complainants all the protection to which they are entitled, and will not unduly restrict defendants' activities in the operation and exploitation of the part of this cave underlying the land owned and controlled by the Mammoth Cave Developing Company.

Affirmed.