## N. S. W. CO. v. WHOLESALE LUMBER & MILLWORK, Inc.

### No. 8619.

Circuit Court of Appeals, Sixth Circuit.

Oct. 11, 1941.

George Rex Frye, of Detroit, Mich. (Swan, Frye & Hardesty, of Detroit Mich., on the brief), for appellants.

Elmer J. Gray, of Detroit, Mich. (Dike, Calver & Gray and Fildew & DeGree, all of Detroit, Mich., on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Appellants, the N. S. W. Company, a Michigan corporation, herein called the Company, and Helen R. Howenstein, a resident of Michigan, are licensee and owner, respectively, of Patent #1,743,454 issued January 14, 1930, to G. H. Howenstein. The appellees, Wholesale Lumber & Millwork, Inc., herein called Wholesale, and Currier Lumber Company, are both Michigan corporations.

The patent is for a "Sash Guide." Appellants sued appellees for infringement of the patent; for infringement of the trademarks "Non-Stick Window" and "N. S. W. Co.," registered respectively on October 27, 1936, and January 12, 1937, and used in connection with window assemblies in which the patented sash guide was installed; and for unfair competition arising from the sale by appellees of window assemblies identified as "N. S. W. Windows" and as "Never-Stick Windows" or any imitations calculated to deceive the public. There were prayers for an injunction, for an accounting, and for three-fold damages.

The chief defense to the charge of patent infringement was invalidity, because of anticipation and failure to describe the invention in such full, clear, precise and exact terms as to enable one skilled in the art to construct the patented device.

The District Court dismissed the bill upon its findings that the patent was anticipated; that the term "Non-Stick Window" or "Non-Stick" as applied to windows was descriptive and not susceptible to appropriation for trade-mark purposes, and had not acquired a secondary meaning in connection with appellants' business within that portion of Michigan where infringement was alleged to have occurred.

The specification disclosed that the patent was designed, " * * * to provide a sash guide formed of sheet metal and adapted to be secured to a window frame to provide ways in which the sash may

slide vertically and adapted to prevent the sash from binding in the frame due to swelling or warping of the wood sash or frame * * * including a parting stop and weather strips * * * so arranged that the wood sash are shielded by metal from contact with the wood of the window frame to prevent wood to wood contact between the sash and frame and allowing the sash to slide freely in the frame at all times."

The window lining, or liner, was a piece of rustless sheet metal, designed to be attached to the vertical member of an ordinary "double hung" wooden window frame and was formed to provide a parting stop between the sash (eliminating the necessity for the ordinary wooden parting stop and the grooving of the jamb to receive it) with flanges along each edge, against which the blind or outside stop and finish, or inside stop abutted. Ways for the two sash were thus formed on either side of the metal parting stop, between it and the two flanges. The metal in each sash way was folded to form narrow ribs for weather stripping purposes which projected into corresponding grooves rabbeted into the edges of the wooden sash.

The device, in thus providing means for eliminating the wooden parting stop and grooving to receive it, simplified frame construction. It did away with a wood to wood contact between the sash and frame, thus reducing one cause of sticking, and providing metal surfaces which could easily be cleaned of paint. The metal ways and ribs, being uniformly spaced, the sash could be rabbeted and fitted into the frame at the factory, and the assembly could be shipped and installed as a unit. Assuming that these features denote improvements, it does not follow that they denote invention.

The specification and drawings indicate that nails or screws securing the guide to the frame were inserted through holes placed between the ribs and the flanges, it being claimed, at the trial, for this construction that the central portion was thus left free to "float" or move, laterally, between the ribs to accommodate excessive swelling of the sash and adjacent members during bad weather. Appellants' theory was that the lateral motion originated in the spaced weather strip beads or ribs which acted as "hinges" therefor. In other words, it was claimed at the trial that the central part would move back and forth between the folds of these ribs, while the outer portions of the liner remained stationary.

Appellees admit infringement of Claims 2 and 3, if valid. Claim 2 is similar to 3, and Claim 1 is similar with the added element of a guide across the top of the window frame. Claim 2 follows:

"A sash guide comprising a strip of sheet metal formed to provide a parting stop extending longitudinally thereof through the center, the outer edges of the strip being turned inwardly in spaced relation with the parting stop and forming sash grooves each side of the parting stop, the strip being formed to provide a weather strip rib on each side of the parting stop in the bottom of the sash groove extending longitudinally of the strip in parallel relation with the parting stop."

Tested by this claim as written, it is apparent that Howenstein has not advanced the art. We need only to refer to the patent to Singer, #940,485, November 16, 1909, which had an auxiliary frame or liner of sheet metal with a central rib (parting strip) and guide flanges, with narrow tongues or ribs turned in from one flange and from the parting strip, to fit grooves in the sides of the two sash for weather stripping purposes. This is identical with the liner in Howenstein except that in Howenstein the ribs were located to fit grooves in the edges of the sash rather than in their sides. It is not invention to change the position of elements in combination which but for the alleged "hinge" feature had precisely the same weather stripping function. Disc Grader & Plow Co. v. Austin-Western Road Mach. Co., 8 Cir., 254 F. 430; United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 62 F.2d 881.

With reference to the "floating" feature above indicated, appellants' difficulty is, that it is dependent upon elements and inter-relations which are neither claimed nor clearly disclosed. All that is called for in the claims is a simple sash guide. There is no claim for a combination of sash, frame and sash guide. If we take it for granted that such combination is employed from the use of the term "sash guide" in the claims, there is nothing in the claim that the liner, to allow for the "floating" feature, must be attached to the frame at the points in the sash ways outside the ribs rather than, for instance, between the ribs and parting stop. The confusion is

heightened by the fact that in the drawing the fastenings are in each case made in the wide part of the sash way, whereas, in Exhibit P2 the ribs are so spaced that in order to provide for the "floating" feature one fastening must be in the side part and the other in the narrow. Nor is the "floating" feature clearly disclosed in the specification, since it also states that in old buildings "the metal parting stop * * * may be positioned directly over the ordinary wooden parting stop," an assembly which would most certainly render the "floating" feature immovable; and the drawings themselves show a snugness of fitting between the liner and sash, which would also operate against the perception of the floating feature by one trying to follow the patent.

■ The patent cannot be validated because of an obscure feature which not only is not claimed, but which is operative, if at all, only in combination with another element that is not claimed, and the operation of which is disclosed in contradictory fashion in the specification and drawings. In Featheredge Rubber Co. v. Miller Rubber Co., 6 Cir., 259 F. 565, 570, we said:

"The trouble here is that those ordinarily skilled could not practice the invention with even a tolerable degree of success, unless after a series of blind experimentation, which might happen to give the necessary information, but might not."

The defectiveness of the claim is not rectified by the reference to the specification and drawings.

■ Appellants claim that appellees are not entitled to question the validity of the patent because of their plea that all of the alleged infringing acts were licensed under a written contract of a certain date. This position is untenable. By suing appellees for infringement, appellants took the position that the license was at an end and they cannot at the same time insist that the license is operative to prevent appellees from setting up invalidity as a defense. Dueber Watch-Case Mfg. Co. v. Robbins, 6 Cir., 75 F. 17, 26; Tate v. Baltimore & O. R. Co., 4 Cir., 229 F. 141, 143. See, also, Indiana Mfg. Co. v. Nichols & Shepard Co., C.C., 190 F. 579, 584.

### The Trade-Marks.

■ The features of the patent stressed most in the specifications were those which induced a freely sliding sash, and eliminated sticking, even though the wooden sash and jamb swelled in wet weather, and the Company, in its advertising and promotional work, referred to the windows using its liners as "Non-Stick" windows; and using the initials of its product, called itself the "N. S. W." Company. Appellees used the name "Non-Stick" and "Never Stick Window" for a time in connection with window assemblies sold after its contract with the Company had been broken and after it had ceased to use the genuine N. S. W. liner. It seems clear enough that the Company is not entitled to protection upon a name which is plainly descriptive, unless the name has acquired a secondary meaning,—a question to be discussed. The non-sticking characteristic was emphasized in the patent and in the Company's advertising, but it was equally descriptive of the freely sliding quality of any other window assembly, and the terms "Non-Stick" and "Non-Stick Window" may not be protected as such. Detroit Show Case Co. v. Kawneer Mfg. Co., 6 Cir., 250 F. 234, 239; Wyatt v. Mammoth Cave Development Co., 6 Cir., 26 F. 2d 322, 325.

### Unfair Competition.

■ Appellees contend that if the patent and trade-marks are held invalid, the question of unfair competition is foreclosed for lack of jurisdiction because no diversity of citizenship exists. We think that the case of Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195, is decisive of the point in appellants' favor.

In 1928, before the issuance of the Howenstein patent, he exclusively licensed Parkinson and Glass to manufacture and sell his sash guide. In March 1929 these two organized the Company at Detroit and assigned their interest to it. The Company at once began manufacturing, marketing and advertising. Early in 1929 it put out an advertisement for distribution at the Detroit Builders Show. It also got out a pamphlet for the 1930 show. This was its last advertising until 1934. Between 1929 and 1934 it made oral contracts with jobbers in Toledo, Cleveland, Indianapolis, Pittsburgh, Buffalo and elsewhere. One or two of these advertised the "N. S. W." or "Non-Stick" window in their price lists and elsewhere, using these terms in connection with their own businesses, one for instance, referring to the window as the "'Biltwell' Non-Stick Window."

It was the practice for the Company to sell the metal liner and Pullman balances, the representatives obtaining or manufacturing the frame and assembling the liner, frame and sash, and selling the unit as the "N. S. W." or "Non-Stick Window." The Company did not fix the prices on the assembled product, although Parkinson, its president, testified, that it specified a higher standard and quality of frame,—a heavier jamb,—in order that the metal would work properly, and, in the agency contracts, seems to have defined sales areas.

Parkinson testified that the patented device was first marketed in the Detroit area early in 1929 by two men operating as the N. S. W. Sales Company. The Company also had a traveling man with contacts in Flint, Saginaw, Lansing, Grand Rapids, Kalamazoo and possibly Jackson. The Detroit connection was severed in 1930 and a Mr. Mackey was taken on there who operated under the name of Non Stick Window of Michigan until 1932, when he commenced work for the MacIvor Lumber Company handling what N. S. W. business there was on the side. Between 1930 and 1933, when business was bad, Mackey sold to between 20 and 25 dealers and about 200 builders.

Parkinson testified that by 1933 their business had dropped to practically nothing and in 1933 or early in 1934 he approached Mr. P. J. Currier, owner and operator of the Currier Lumber Company, which did approximately 50% of the general lumber business in Detroit and had branches throughout Michigan, with the idea of interesting Currier in handling the N. S. W. metal. This move represented a departure from the Company's practice of dealing solely with jobbers; but Parkinson testified that "the jobbing situation in Detroit * * * always has been a very precarious one, due to the fact that the larger lumber companies * * * insist in buying direct from mills, that it makes it very hard for a wholesaler to exist, and it was a question in our minds at that time whether or not we would do as the lumber dealers * * * have requested us to do in our local territory here, break down our jobbing sales policy and sell to lumber dealers. * * *"

It developed in the conversations between Parkinson and Currier that Currier planned to form a wholesale department and the upshot was that Wholesale, which had been previously organized with Currier as principal stockholder, entered into an oral contract with the Company for the metal, and at Parkinson's suggestion, Mackey, who had had experience with the N. S. W. window, was brought into Wholesale.

Currier testified that when his Company took over in 1934, the N. S. W. business was "cold," that "Nobody knew anything about it, * * *" and that during the remainder of 1934, his cost of advertising the N. S. W. item alone was $9,500 to $10,000; and that in 1935 his firms spent $30,000 to $40,000 on advertising, and that this window was the leader on all the advertising. He testified that it was hard to get anybody to use them in 1934, but by 1935 it "started to go pretty good * * * and it appeared that we would get into the profit column very soon"; that the increase in sales was greater in proportion than the increase in business. He testified the sales prospects were so good that his firm could not manufacture enough frames and that he had to contract outside for the business he expected in 1936.

Late in 1935, Currier tried to get the Company to put their contract in writing, and Mr. Glass of the Company sent a letter to Wholesale dating it back to April 10, 1934, purporting to embody the contract. This was unacceptable. Another draft was sent to Wholesale early in 1936 in which there was a clause that the agreement would be null and void if Wholesale ceased to be a legitimate jobber. Finally negotiations broke down and on February 23, 1936, Glass wrote Wholesale,—"We will be unable to accept any further orders from you for our N. S. W. units. We will, of course, expect to fill all orders from you which we have received prior to this date."

We are unable to ascertain the terms of the original oral contract or to decide just why it was terminated. There is testimony that Wholesale had ceased to do a jobbing business and had become simply a buyer for the other Currier businesses, and that representatives of other jobbers were complaining. On the other hand, there is evidence pointing to the conclusion that business was improving and that Mackey, who left Wholesale to form a company to sell the N. S. W. metal, persuaded the Company to end the contract in his interest. However, after the termination, Wholesale for a time got some metal from N. S. W. and from one of its representatives in

Chicago. All access to the metal seems to have been cut off by a letter from Glass to Wholesale on April 20, 1936, and thereafter for a time Wholesale bought from the Kawneer Company, an independent, which made dies and produced the metal. Currier testified that this expedient was necessary in order to get metal to supply the orders, and to use up the stock of frames.

Thereupon there was a race to gain control of the initials N. S. W. and the possible terms using those initials, by registration. On April 3, 1936, Wholesale filed two such terms with the Michigan Corporation and Securities Commission, these being "Non Stick Window" and "Never Stick Window;" and on April 10, 1936, it filed eight more, of which "New Slide Window" and "Not Stick Window" are typical. The Company's Trade-Marks "Non-Stick Window" and "N. S. W. Co." were not, as we have noted, filed with the United States Patent Office until October 1936 and January 1937.

Currier testified that they began the manufacture of a lighter frame in March or April, 1936, which they called the "Never Stick" and later acquired rights under another patent for a two-piece liner, which appellants concede does not infringe the Howenstein patent; and sold it throughout 1936 under the name "Never Stick" and for six or eight months in 1937 under the name "Currier Never Stick," after which the name was changed to the "Weatherproof" Window.

■ On these facts we think appellants are entitled to an injunction against appellees forbidding the use of the name "Non-Stick" or colorable imitations, such as "Never Stick" and "Currier Never Stick" in conjunction with the sale of window frame assemblies. Although sales of window frames using the N. S. W. liner were not large prior to the contract of 1934, we think they were substantial and adequate enough to preempt the field for the Company in the use of the titles in issue. They have been advertised and that the sales were not large seems to have been due in considerable measure to dullness in the building field. Sales had been sufficient to create confusion as to which window was meant after Currier entered the field on his own. Certainly the distinguishing feature of the frames, whether sold in 1934-5 or prior thereto was the N. S. W. liner, which was supplied by the Company, and the fact that Currier later sold similar frames under similar names was calculated to and did deceive some buyers.

■ However, because of the abruptness with which the contract was terminated and because of the testimony that Wholesale had built up stocks of frames in anticipation of obtaining N. S. W. liners indefinitely, we think the Company cannot complain of the sales of frames through the remainder of 1936 under the names "Non Stick" and "Never Stick."

But the mass registration of similar names with the Michigan Corporation and Securities Commission in April, 1936, indicates an attempt on the part of appellees to seize the market and we think that after the year 1936 the name "Currier Never Stick" competed unfairly with the N. S. W. G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369; Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657; Dickinson v. O. & W. Thum Co., 6 Cir., 8 F.2d 570; Western Oil Ref. Co. v. Jones, 6 Cir., 27 F.2d 205.

The decree upon the unfair competition feature is modified and the cause reversed with directions that an accounting be ordered to determine the profits to Wholesale upon sales made under the name "Currier Never Stick" after the year 1936; and that an injunction issue against the appellees, their officers and agents, forbidding the use of the names "Never Stick," "Currier Never Stick" or colorable imitations thereof. So modified, the decree of the District Court is affirmed.