**DREXEL ENTERPRISES, INC.**

v.

**HERMITAGE CABINET SHOP, INC.**

Civ. A. No. 1741.

United States District Court
N. D. Georgia,
Rome Division.

Jan. 19, 1967.

Rogers, Magruder & Hoyt, Rome, Ga., Gilbert H. Weil and Alfred T. Lee, New York City, for plaintiff.

Glenn T. York, Jr., Cedartown, Ga., Matthews, Maddox, Walton & Smith, Rome, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This is a suit brought under the trademark and unfair competition laws of the United States and the State of Georgia, the plaintiff alleging in brief that since 1939, the plaintiff has manufactured, sold, and advertised furniture products under the name of "HERITAGE"; that, subsequently, the defendant began to use and is now using the trademark "HER-MITAGE" which, it is alleged, is likely to cause public confusion and to cause the public to believe that the furniture sold by defendants are the goods of plaintiff, or that plaintiff and defendant are in some way associated with each other, or that the plaintiff has sponsored, endorsed, or approved the defendant's goods.

The defendant's answer denied the essential allegations of the complaint and set forth several other defenses.

At pre-trial, the issues were narrowed to provide for a speedy non-jury trial on the issue of infringement only. At the trial, there was considerable stipulation by the parties and a large amount of documentary evidence as well as oral testimony. From all of such sources, the court makes the following

### FINDINGS OF FACT

Plaintiff is a corporation organized and existing under the laws of the State of Delaware, with its principal offices located in the State of North Carolina.

Beginning in the year 1939, HERITAGE Furniture, Inc., a corporation of the State of North Carolina, manufactured, advertised and sold furniture under the name and mark "HERITAGE."

Advertising featuring the said name and mark "HERITAGE" appeared in national magazines at least as early as 1946.

Plaintiff registered its trademark "HERITAGE" in 1942 in the states of Alabama, Florida, Tennessee and Georgia and prior to 1950, when defendant commenced operations, the mark was also registered in Illinois, Texas, Ohio, North Carolina, South Carolina, Mississippi and Virginia, all of which were assigned to plaintiff.

During the 1940's, at their own expense, retail dealers in various parts of the country advertised the goods of Heritage Furniture, Inc. in local newspapers under the name and mark "HERITAGE" at least as early as 1947.

Considerable annual sales were made by Heritage into those states prior to 1950. At least as early as 1941–43, its goods were being sold in Alabama, Florida, Georgia, Ohio, Virginia, Illinois, North Carolina, and Texas, as well as many other states throughout the country. In Tennessee, the plaintiff sold over $100,000 worth of goods in the period 1946–1949.

From 1950 to 1956 Heritage Furniture, Inc. operated under a marketing arrangement with Heritage Furniture Industries, Inc., pursuant to which the furniture pieces of the parties were coordinated in style and design and advertised and sold under the combination of their individual marks, to-wit: Heritage-Henredon.

Among the publications carrying advertisements were House & Gardens, House Beautiful and Holiday. The bulk

of sales and advertising was under the combination marks, however, Heritage Furniture, Inc. continued throughout to feature its corporate name in a small part of the advertising, and to market a portion of the production labeled as "HERITAGE". Also, some of its retail dealers continued to use the mark "HERITAGE", as such, in their newspaper advertising.

In 1956, the joint marketing arrangement between Heritage Furniture, Inc. and Henredon Furniture Industries, Inc. terminated. Thereupon Heritage discontinued all use of the combination marks and used "HERITAGE" as such in its advertising and on its goods. The mark was applied to the goods by means of woven labels, hang tags and burned-in brand.

On November 30, 1960, Heritage Furniture, Inc. was merged into Drexel Enterprises, Inc., the latter acquiring all assets of the former, including its right in the name and mark "HERITAGE", and all registrations thereof. The business formerly conducted by Heritage Furniture, Inc. has since that date been conducted without interruption and is now being conducted by Drexel Enterprises, Inc. under the name and mark "HERITAGE" through a division known as Heritage Furniture Company.

Plaintiff has also received free publicity in the advertising of its suppliers, which featured the fact that its goods were the goods and components of the plaintiff's furniture.

Plaintiff is also owner of registrations of the trademark "HERITAGE" granted by the United States Patent Office to Heritage Furniture, Inc. for furniture, and subsequently assigned to plaintiff, such registrations being identified as Registration No. 444,792, issued on October 20, 1953; and No. 599,977, issued on December 28, 1954.

In 1942 Heritage Furniture, Inc. registered "HERITAGE" in the states of Alabama, Florida, Tennessee and Georgia, such registrations having been assigned to Plaintiff on November 30, 1960.

Plaintiff's "HERITAGE" furniture is a high quality line, usually traditional in design, and generally sells in the upper price range. It includes "case" goods, but upholstered chairs and sofas constitute about 60% of its business.

Hermitage Cabinet Shops was a corporation incorporated under the laws of the State of Tennessee in March, 1947.

From 1947–1950, it produced reproductions of small articles of furniture contained in the "Hermitage", home of Andrew Jackson. These sales were made from the shop and so far as the evidence discloses unmarked.

In February, 1950, Hermitage Cabinet Shop, Inc. was incorporated under the laws of the State of Tennessee, with Mr. J. W. Gepford as principal stockholder. Hermitage Cabinet Shop, Inc. purchased the inventory and machinery of the corporation known as Hermitage Cabinet Shops in February, 1950.

Defendant Hermitage Cabinet Shop, Inc. is a corporation formed under the laws of the State of Tennessee in 1950. Beginning on or about February 9, 1950, it manufactured furniture which it sold at retail from its manufacturing premises in Nashville, Tennessee. Sales during that period approximated $60,000. Small space ads in which the company's corporate name appeared were run in a local Nashville newspaper on an irregular basis.

From 1950–1954, chairs were added to the production of the company and constituted the sole production by 1955. Occasional and casual sales were apparently made outside the Nashville area. While the articles, mostly chairs, were invoiced and billed under the corporate name, including the word "HERMITAGE", the products were not marketed as such and there is no satisfactory showing of use of the name on the product or the time and place such sales were made during this period. The conclusions of the use of the Heritage name outside the Nashville area are based entirely on the "recollection" of the witness Gepford prior to 1955.

Not until 1961 did defendant undertake any real effort to sell its goods under the name "HERMITAGE" in states other than Tennessee.

Beginning approximately 1954 the defendant sold its goods exclusively through Kreb-Stengel, a broker in New York City, which in turn resold them to retail stores under the Kreb-Stengel name. The sales in that year approximated $200,000. Most of the time defendant's corporate name was not used in connection with the retail sale of the goods; however, the defendant's corporate name appeared on a small woven label under the cushion of upholstered furniture sold by it to Kreb-Stengel in those states where such identification of a manufacturer rather than the distributor was mandatory.

The word "HERMITAGE" is the name of the home of President Andrew Jackson located in Nashville, Tennessee. The word is used in Tennessee as a part of the name of many different businesses.

According to Webster's New International Dictionary, Second Edition, "Hermitage" as a noun is defined to be: 1. The habitation of a hermit; a secluded residence. It is also listed as a pronoun. 2. A mansion near Nashville, Tennessee, long the home of Andrew Jackson, and now owned by the State. "Hermitage" as a noun is defined to be: 1. That which is inherited or passes from heir to heir. The World Book Encyclopedia contains information regarding "Hermitage" and identifies it as the home of Andrew Jackson, near Nashville, Tennessee. The current Nashville, Tennessee, telephone directory carries approximately thirty (30) listings of which the word "Hermitage" is a part.

In or about the year 1960, defendant transferred a portion of its manufacturing operations to Cedartown. Sales during that year approximated $600,000. Within a year or two thereafter, it ceased manufacturing in Nashville, and presently its production facilities are limited to the area of Cedartown, Georgia.

Commencing in 1961, the defendant, while still continuing to sell to Kreb-Stengel as aforesaid, hired an independent commission agent to sell its products in the State of Georgia to retail furniture stores. Thereafter, it extended its distribution through commission agents to a number of other states in the southeastern portion of the country.

In 1965, and except for what it sold to Kreb-Stengel for resale under the latter's name, defendant's sales were primarily limited to retail stores in the States of Alabama, Florida, Georgia, and Tennessee. Its sales during that year approximated $325,000.

With one exception the only use made by defendant of the word "HERMITAGE" on the goods sold by it through commission agents has been as part of its corporate name printed on woven labels and tabs under the cushion of its upholstered furniture. The one exception involved its use of cloth streamers displayed across a quantity of upholstered pieces. The streamers featured the component material of one of defendant's suppliers and included defendant's corporate name, as well.

Defendant has also used a brochure containing photographs showing the defendant's goods, and featuring the words "Selections from Hermitage" and the defendant's corporate name with the word "HERMITAGE" appearing in much larger letters than the words "Cabinet Shop, Inc." These materials have been employed by defendant's commission agents in soliciting orders from retail dealers. Such materials are also left with the retail dealers for display by them to their customers.

The defendant produced upholstered and wooden furniture until the close of its Nashville operation. Presently it produces only upholstery. Part of defendant's production of upholstered furniture is a modern design, part of it is Contemporary and some little amount is Colonial in style.

By letter dated April 5, 1962, Plaintiff notified defendant of the former's objection to the use of the term "HERMITAGE" in connection with furniture, and substantial correspondence was ex-

changed between the parties prior to the institution of this suit on January 7, 1966.

Defendant's goods are described as promotional items which are sold by retail dealers as a "loss leader", to promote store traffic, and may generally be described as low-quality.

Under new management during the past year, defendant is expanding its sales nationally and intends to extend its sales throughout the United States.

## CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the subject matter herein. 15 U.S.C.A. § 1051 ff.; 28 U.S.C.A. § 1338.

■ Without an extended and laborious recitation of the reasons and statistics, already reviewed at length by other courts, it can readily be concluded that the plaintiff has established a valid right to the exclusive use of its name and mark "HERITAGE", unabandoned by any prior dealings. While it is a dictionary word in common use, it has undoubtedly attained a secondary meaning identifying the products of plaintiff with the general public. See Drexel Enterprises, Inc. v. Richardson, 312 F.2d 525 (10) (10th Cir. 1962); Drexel Enterprises, Inc. v. Heritage House of Dallas, Inc., 136 U.S.P.Q. 415 (N.D. Tex. 1963); Drexel Enterprises, Inc. v. Colby, et al, 138 U.S.P.Q. 1 (S.D. Col. 1963); Drexel Enterprises, Inc. v. American Heritage, Inc., 142 U.S.P.Q. 194 (D.C. Conn. 1964). What has been said there is adopted here as it relates to plaintiff's acquisition, of the name over a long period of time.[1]

Insofar as is relative to this contest, it is also concluded that the plaintiff had acquired such use in the states affected prior to 1950 and prior to its federal registration in 1953 and 1954.

It is doubtful that anyone could prevent the use of the name Hermitage in the Nashville area because of its local historical and geographical use and widespread public appropriation there. See Wyatt v. Mammoth Cave Development Co., 26 F.2d 322 (6th Cir. 1928); 3 Callman, Unfair Competition and Trade Marks (2d Ed.) § 72.1 ff., especially § 72.6.

■ However, the defendant now operates in Georgia and insofar as its minor Tennessee operation in Nashville, it was preceded by plaintiff within the state.[2] If the guiding rule is that the minimum area of trademark protection is statewide, as between the parties here, the defendant would have to yield to plaintiff even in Tennessee, providing there is conflict between the two names. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403 at 424, 426, 36 S.Ct. 357, 60 L.Ed. 713 (1916); Federal Glass Co. v. Loshin, 224 F.2d 100 at 102 (2d Cir. 1955). As a national distributor, certainly plaintiff's activities in Tennessee were in a "zone of potential good will", or natural area of expansion. See 3 Callman, Unfair Competition and Trade-Marks (2d Ed.) § 76.3; Theodore Rectanus Co. v. United Drug Co., 226 F. 545 (6th Cir. 1915). Any claims resting in defendant by virtue of prior-user are not seriously advanced either by the evidence or by brief. In that connection, the legal burden shifted to defendant to do so and in this respect it failed. See Grove Laboratories v. Brewer & Co., 103 F.2d 175 (1st Cir. 1939). If there was any use by defendant from 1950 up to federal registration by plaintiff, it was not a deliberate and continuous use, but was merely sporadic, casual, and fortuitous. 3 Callman, Unfair Competition and Trade Marks (2d Ed.) § 76.2(d).

Accordingly, plaintiff is deemed to have established its ownership to its own

---

1. Further information may be obtained from the contests involving Heritage before the Patent Office Trademark Trial and Appeal Board at 138 U.S.P.Q. 88 (1963), 147 U.S.P.Q. 330 (1965), 148 U.S.P.Q. 92 (1966), 150 U.S.P.Q. 392 (1966).

2. Plaintiff's mark was registered there in 1942 and it did extensive advertising and made substantial sales from 1942–1950.

mark "HERITAGE" prior to any use by defendant of its mark "HERMIT-AGE." By a reverse process we thus arrive at the primary and really threshold question in this case, namely, whether the two marks are confusingly similar. Here, the court's first impression was that defendant's use of its name, primarily through "law labels" was so insignificant that no public confusion had resulted. However, the defendant asserts here its right to use the name HERMITAGE in any manner it deems fit and to use it in its national expansion program. It is therefore necessary to reach the basic decision of whether the marks are in conflict or not. Once that determination is made, present use might add to or detract from the conflict on the question of infringement, but not change the determination itself. Typically here the court has been inundated with citations holding other marks confusingly similar or dissimilar. Like sheets of statistics, such examples can be used to prove or disprove any proposition without really forming a satisfactory basis for the ultimate conclusion. A restriction of research to the cases in this circuit is of little help if such an approach to the problem is adopted, and it is therefore rejected.

In considering the prime question, defendant lays great stress on the absence of proof of any actual confusion and, quite frankly plaintiff rests its case on a comparison of the words themselves. The definitive opinion in this circuit on the lack of necessity for proof of actual confusion or actual damage was rendered by Judge Borah in 1957:

"The argument is not persuasive. We take it to be the accepted rule that to establish infringement, plaintiff need only show as it did here that the name adopted by defendants is so similar to its trademark as to be *likely* to cause confusion among reasonably careful purchasers. The applicable statute, 15 U.S.C.A. § 1114(1) requires only that in an action for trademark infringement the colorable imitation be ✱ ✱ ✱ ✱ likely to cause confusion

or mistake.' And here the evidence clearly supports the court's findings that the manner in which defendants imitated plaintiff's trademark will not only inevitably cause confusion and deception to the consuming public, but that defendants by their intentional act of imitation have demonstrated their belief that there will be deception. Nor is there any merit to appellants' claim that there has been no showing of actual instances of deception or confusion, for no such evidence was required. [citing authorities]. The authorities are legion in holding that proof of actual deception is not needed to justify an injunction against the use of a trademark if it is of such a character or used in such a way as to be likely to deceive a prospective purchaser, and that similarity of sound as well as appearance may be taken into account in weighing this probability. [citing authorities]. Likewise, appellants can derive no comfort from the argument that the injunction was improperly granted because there was no proof that Coro, Inc. sustained any damage, for as we said in Pure Foods, Inc. v. Minute Maid Corp., 5 Cir., 214 F.2d 792, 797: 'To authorize preventive relief through the issuance of an injunction proof of actual damage is not necessary, but the likelihood of damage is sufficient. [citing authorities].'"

Abramson v. Coro, Inc., 240 F.2d 854 at 856, 857 (5th Cir. 1957). See also Singer Mfg. Co. v. Briley, 5 Cir., 207 F.2d 519 (5th Cir. 1953); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619(5) (5th Cir. 1963). Further, it is reasoned that this circuit is amongst those jurisdictions where the owner need not stand idly by until actual confusion and actual damage occurs if there is likelihood of future confusion. See B. Altman & Co. v. Young Colony, Inc., 36 N.Y.S. 2d 781 (N.Y.Sup.Ct.1942). The need for diligence could hardly dictate otherwise. La Republique Francaise v. Saratoga Vichy Spring Co., 191 U.S. 427(2), 24 S.Ct. 145, 48 L.Ed. 247 (1903).

538

There is little difficulty in reaching the conclusion that defendant's adoption of its mark was not wilful or intentional. By chance, it was adopted as part of its corporate name. However, the absence of intent or bad faith furnishes no defense. American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619(13) (5th Cir. 1963); Thompson v. Alpine Motor Lodge, Inc., 296 F.2d 497 (5th Cir. 1961). It, like present use, could only add to or detract from a determination of infringement. Nor does the fortuitous adoption of HERMITAGE as a part of the corporate name confer any greater rights than a non-corporate name. Unless the corporate name involves the surname of an individual, it is treated like any other trade-mark. 15 U.S.C.A. § 1052(e) (3); Kimberly Clark Corp. v. Marzall, 94 F.Supp. 254 (D.C.1950), aff'd 90 U.S.App.D.C. 409, 196 F.2d 772; 3 Callman, Unfair Competition and Trade Marks (2d Ed.) § 98.6(a) at 2156; Nims, Unfair Competition and Trade Marks (4th Ed.), page 252.

As stated, the plaintiff relies primarily on the ocular test. The legal sufficiency of such a test is recognized in this circuit. Frostie Company v. Dr. Pepper Company, 341 F.2d 363(5) (5th Cir. 1965); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 at 624 (2-6) (5th Cir. 1963). This is nothing more than a common-sense test in each case in which the court sits in the dual capacity of a prospective purchaser in comparing the two and as judge of the extent of similarity. Here, the factual test is not that of a careful and discriminatory purchaser, but that of an "ordinary and casual buyer" (Singer Mfg. Co. v. Briley, 207 F.2d 519 at N 3 [5th Cir. 1953]) or a "usual purchaser." (Sun-Maid Raisin Growers of Cal. v. Sunaid Food Products, Inc., 356 F.2d 467 (5th Cir. 1966) or perhaps even an "ignorant, inexperienced, and gullible" purchaser (Tisch Hotels, Inc. v. Atlanta Americana Motor Hotel Corp., 254 F. Supp. 743 [N.D.Ga.1966]). Certainly,

in determining likelihood of confusion, the court may not assume that an ordinary purchaser is thoroughly familiar with the products of both parties. Frostie Company v. Dr. Pepper Company, 341 F.2d 363(7) (5th Cir. 1965).

On such a premise, the court concludes that the two marks are confusingly similar. "HERITAGE" and "HERMITAGE" not only are identical but for a single letter, but that letter by its position in the middle of the word and its lack of graphic or phonetic distinction, does not substantially affect either the appearance or pronunciation of defendant's identification from that of plaintiff's. Webster's [3] and common use allow each only a single pronunciation. Both to the eye and to the ear, and whether juxtaposed or considered apart, the terms are so nearly identical as to evoke the same mental impression when each is seen or heard, particularly where recollection of the other is neither clear nor precise to the mythical prospective purchaser. This determination is influenced to some extent by the intermixture of the two words during the trial and by the court during the preparation of this opinion.

Legally speaking the court thus holds that the plaintiff has carried the burden of showing confusing similarity between the marks in question and that defendant's mark is of such character as is likely to confuse a prospective purchaser.

Of course, a striking similarity in and of itself does not necessarily mean there is an infringement when the products are not in competition and people, therefore, are not likely to be confused as was the case in Sears-Roebuck & Co. v. All States Life Insurance Co., 246 F.2d 161 (5th Cir. 1957) and Sun-Maid Raisin Growers of Cal. v. Sunaid Food Products, Inc., 356 F.2d 467 (5th Cir. 1966). However, even where the products are different but similarly marketed, relief is granted as was the case in Pure Foods v. Minute Maid Corp., 214 F.2d 792 (5th Cir. 1954). Here, there

3. hef it-age (hĕf ĭ tĭj)—hef mit-age (hûŕmĭ-tĭj)

is obvious resemblance between the products as to form, shape, texture, and overall appearance. The products are, or could be, marketed in any retail furniture store, even side-by-side. Defendant's distinction as to price is not persuasive. Neither superiority or inferiority constitutes a defense. 3 Callman, Unfair Competition and Trade Marks, (2d Ed.) § 80.2 at 1364. The judicial presumption is that the infringer's product is of inferior quality anyway. Peninsular Chemical Co. v. Levinson, 247 F. 658 (6th Cir. 1917). Accordingly, all defenses must yield to the plaintiff's case as proved.

Having determined that plaintiff is entitled to injunctive relief, an appropriate decree prohibiting use of defendant's name "HERMITAGE" in connection with the present and future sale of its furniture products consistent with this opinion may be presented.

The plaintiff having tentatively waived its claim for damages and none being shown, a future trial on such issue should not be necessary.

It is so ordered.